**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

                    v.

LEONAR NELLINO SEGURA PERLAZA,
                    *Defendant-Appellant.*

No. 02-50084
D.C. No.
CR-00-03209-TJW

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

                    v.

GUSTAVO SALAZAR PALACIOS,
                    *Defendant-Appellant.*

No. 02-50089
D.C. No.
CR-00-03209-TJW

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

                    v.

HUGO MARQUEZ,
                    *Defendant-Appellant.*

No. 02-50093
D.C. No.
CR-00-03209-W-08

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

JOSE WALTER ROMAN SOLIS-
BARNAZA, aka Jose Walter Rodman
Solis Barnaza,
*Defendant-Appellant.*

No. 02-50102

D.C. No.
CR-00-03209-TJW

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

MANUEL PLACIDO RENGIFO-AUDIVER,
*Defendant-Appellant.*

No. 02-50108

D.C. No.
CR-00-03209-W

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

CARLOS JULIO VALENCIA-SANCHEZ,
*Defendant-Appellant.*

No. 02-50133

D.C. No.
CR-00-03209-W

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

JOSE NEFFER CASTRO-CARVAJAL,
*Defendant-Appellant.*

No. 02-50136

D.C. No.
CR-00-03209-TJW

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

      v.

DIONASIO ABORNO,
        *Defendant-Appellant.*

No. 02-50188
D.C. No.
CR-00-03209-TJW

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

      v.

FERNANDO LOPEZ,
        *Defendant-Appellant.*

No. 02-50199
D.C. No.
CR-00-03209-TJW

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

      v.

DAVID MURILLO,
        *Defendant-Appellant.*

No. 02-50200
D.C. No.
CR-00-03209-TJW

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

      v.

ABRUAL RECIO CARRASCO,
        *Defendant-Appellant.*

No. 02-50207
D.C. No.
CR-00-03209-TJW
OPINION

Appeal from the United States District Court
for the Southern District of California
Thomas J. Whelan, District Judge, Presiding

Argued and Submitted
February 23, 2004*
Pasadena, California

Filed March 14, 2006

Before: Betty B. Fletcher, Harry Pregerson, and
Melvin Brunetti, Circuit Judges.

Opinion by Judge Pregerson;
Partial Concurrence and Partial Dissent by Judge Brunetti

*This panel unanimously finds No. 02-50108 and No. 02-50136 suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

**COUNSEL**

Jeanne G. Knight (brief), San Diego, California; Janice Deaton (brief & argued), San Diego, California; Michael J. McCabe (brief & argued), San Diego, California; John Lanahan (brief & argued), San Diego, California; Michael J. Messina, Trost, Woods & Messina (brief), San Diego, California; Beverly A. Barnett (brief), San Diego, California; Ezekiel E. Cortez (brief), San Diego, California; D. Chipman Venie (brief), San Diego, California; Casey Donovan, (brief & argued) Donovan & Donovan, San Diego, California; Lori B. Schoenberg (brief & argued), San Diego, California; and Mark Fleming (argued), San Diego, California, for the defendants-appellants.

William V. Gallo (argued), Assistant United States Attorney; Patrick K. O'Toole (argued), Assistant United States Attorney; and Jay Alvarez (brief), Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

## OPINION

PREGERSON, Circuit Judge:

Throughout the late Summer of 2000, the *USS De Wert*, a Navy frigate, and other United States Navy and Coast Guard ships were engaged in maritime surveillance of vessels suspected of drug trafficking in the Eastern waters of the Pacific off the coasts of Ecuador, Colombia, and Peru. On September 11, 2000, the *De Wert*'s radar alerted its crew and members of a United States Coast Guard Law Enforcement Detachment team aboard it to suspicious activity by a speedboat and a Colombian fishing vessel, the *Gran Tauro*, twenty miles away. The *De Wert*'s helicopter was dispatched to the site of the suspicious activity. Once the speedboat's crew realized that they had been detected, they jettisoned cargo (later determined to be approximately 2,000 kilograms of cocaine) and 55-gallon gasoline drums before crashing the speedboat into the stern of the *Gran Tauro* in an apparent attempt to scuttle the speedboat and destroy evidence of illegal activity. United States Navy and Coast Guard personnel suspected that the *Gran Tauro* served as a logistical support vessel for the speedboat by providing gasoline for the speedboat's run from Colombia to Central Mexico.

The five speedboat crew members and seven crew members of the *Gran Tauro* were prosecuted under the Maritime Drug Law Enforcement Act. Two members of the speedboat crew pled guilty, and the remaining ten Defendants opted for a jury trial and were convicted on all charges. These consolidated appeals followed.

We have jurisdiction. *See* 28 U.S.C. § 1291. We reverse the convictions of all ten Defendants who opted for trial and direct the district court to dismiss the indictment because the district court erroneously exercised jurisdiction over them without first requiring the Government to allege in the indictment and prove to a jury beyond a reasonable doubt certain

facts necessary to establish jurisdiction. We also hold alternatively that, even if the district court had jurisdiction over these Defendants, reversal of their convictions would still be required because the Government committed prosecutorial misconduct during closing argument and the district court failed to adequately cure it. Our reversal is without prejudice to re-indictment and retrial because we find that the Government's evidence was sufficient to sustain these Defendants' convictions and that the Government's improper closing argument did not trigger the Double Jeopardy Clause's bar to retrial. We affirm the conviction of one speedboat crew member who pled guilty, but nonetheless appeals, because the sole challenge to his conviction properly before us lacks merit.

## I.   FACTUAL BACKGROUND[1]

The preferred method of smuggling cocaine from South America to the United States in the Eastern Pacific requires the use of speedboats to transfer and land drugs[2] and larger logistical support vessels ("LSVs") to serve as roving refueling stations.[3] LSVs are typically discovered in three transit

---

[1]The following facts are undisputed unless otherwise noted.

[2]"Coast Guard officials refer to such vessels as 'go-fast' boats because they can travel at high rates of speed, which makes them a favored vehicle for drug and alien smuggling operations." *United States v. Rendon*, 354 F.3d 1320, 1322 n.1 (11th Cir. 2003) (quotations and citation omitted). The trial witnesses and parties use the term "Go-Fast" to refer (a) generically to speed boats suspected of transporting drugs between larger vessels or between vessels and land and (b) specifically to the speed boat at issue in this case. We do the same throughout this opinion.

According to the Government's expert, there are three types of Go-Fast vessels used by maritime drug smugglers: (1) 25- to 35-foot vessels with a short range of 250 miles; (2) 35- to 45-foot vessels with an intermediate range of 750 miles; and (3) 45-foot or longer vessels with a long range of 1500 miles.

[3]The term LSV was adopted following the shift in drug smuggling from the Carribean to the Eastern Pacific and the discovery that fishing boats from Latin America were carrying extra fuel, food, and crew for smugglers aboard the Go-Fasts.

corridors between the source of the narcotics (typically, Colombia) and the narcotics' destination (typically, Central Mexico). The first route is along the territorial sea of South and Central American countries. The second is a straight line from Colombia to Mexico. The third route, least used because of distance and cost, is in the Middle Pacific, sufficiently west of the Central and South America coasts to make detection unlikely.

Federal law enforcement has learned that, upon departure, Go-Fast crews are typically given coordinates so they know where to meet their LSVs. At the rendezvous location, a member of the LSV crew provides coordinates for the next LSV meeting. The Go-Fasts and LSVs use global positioning satellite ("GPS") devices to coordinate proper rendezvous. Because of the altitude at which surveillance aircraft fly, neither the United States Coast Guard ("Coast Guard") nor the United States Navy ("Navy") has ever seen an LSV refueling a Go-Fast. Nonetheless, each has seen Go-Fasts rendezvous with LSVs in the Eastern Pacific, and confidential informants have confirmed such events.

## A. Early September 2000 Surveillance of the *Gran Tauro*

In late-Summer 2000, the *De Wert* was conducting a counter-narcotics patrol in the Eastern Pacific off the coasts of Colombia, Ecuador, and Peru. A Coast Guard Law Enforcement Detachment ("LEDET") team and Navy personnel aboard the *De Wert* had information that the *Gran Tauro*, a fishing vessel flying the Colombian flag, was possibly an LSV and one of six vessels possibly involved in drug smuggling. On September 1, 2000, the *De Wert*'s helicopter located the *Gran Tauro* drifting or moving at a very slow speed. Nobody aboard the vessel was fishing. The same observations were made the following evening. On September 3, 2000, the *De Wert* again observed the *Gran Tauro*. Under the "Agreement between the Government of the United States of Amer-

ica and the Government of the Republic of Colombia to Suppress Illicit Traffic by Sea" (the "Bilateral Agreement"), the LEDET team received permission from the Colombian government to board the *Gran Tauro*. The team approached the *Gran Tauro* in a rigid hull inflatable boat ("boarding boat") that can be lowered from and lifted onto a frigate. Coast Guard Chief Warrant Officer Christopher Van Pelt, the boarding officer, noticed the intense smell of gasoline. Once aboard, Van Pelt located the *Gran Tauro*'s master, Defendant José Walter Roman Solis-Barnaza ("Barnaza"), who gave Van Pelt the crew manifest and vessel documentation. Van Pelt identified as members of the crew Defendants Manuel Placido Rengifo-Audiver ("Audiver"), José Neffer Castro-Carvajal ("Carvajal"), Hugo Marquez ("Marquez"), Gustavo Salazar Palacios ("Palacios"), Leonar Nellino Segura Perlaza ("Perlaza"), Carlos Julio Valencia-Sanchez ("Sanchez"), and a fifteen-year-old juvenile. Van Pelt inspected the vessel and noted that its nets were in poor condition, that there was no bait in the fish hold, and that the ice in the fish hold was clean with only one fish visible on top.

Included among the documents that Van Pelt obtained from Barnaza was a *zarpe*[4] that indicated that the *Gran Tauro* had left Buenaventura, Colombia, on August 25, 2000, and was supposed to return on September 25, 2000. The *zarpe* restricted the *Gran Tauro* to fishing in only Buenaventura Zones 2 and 3 and, because the *Gran Tauro* ran on diesel, to carrying only two 55-gallon drums of gasoline for its generators and pumps. Barnaza told Van Pelt that the *Gran Tauro*'s only gasoline was in one blue 55-gallon drum on the *Gran Tauro*'s fantail, but Van Pelt found approximately 6,000 gal-

---

[4]A *zarpe* is a written permit — akin to a visa for marine vessels — authorizing a vessel to leave port and restricting the scope and duration of the vessel's voyage. *See Solano v. Gulf King 55*, 212 F.3d 902, 904 (5th Cir. 2000) (noting that Nicaraguan-imposed regulations require, among other things, "the issuance of zarpe prior to each fishing trip restricting the scope and duration of that trip").

lons of gasoline in a tank aboard the vessel. The information obtained by Van Pelt regarding the *Gran Tauro*'s gasoline supply was relayed to the Colombian government, which asked the LEDET team to order the *Gran Tauro* to return to Buenaventura and report to the Port Captain.

## B.   Continued Surveillance of the *Gran Tauro*

After the September 3, 2000 boarding, the *De Wert* refueled at Golfito, Costa Rica, and was out of contact with the *Gran Tauro* until the *De Wert*'s helicopter reestablished surveillance on September 7, 2000. Using the *De Wert*'s helicopter's Forward Looking Infra-Red Camera ("infra-red camera"), on September 7, 9, and 10, 2000, the helicopter's pilot observed the *Gran Tauro*. No fishing activity was observed, and nothing aboard the vessel appeared to have been moved.

## C.   The Go-Fast and the *Gran Tauro*

In the early morning hours of September 11, 2000, the *De Wert*'s radar showed a vessel moving at approximately eighteen knots in a westerly direction toward another vessel that was moving approximately one to two knots. Shortly thereafter, the two approaching vessels "merged" on the radar screen, meaning that they were no more than 300 yards apart from each other. These two vessels were later visually identified through binoculars from the *De Wert*'s bridge as a Go-Fast and the *Gran Tauro*. The *Gran Tauro* was still well outside its authorized fishing zones — at least 96 miles north of the northwest boundary of Zone 2. Between September 3, 2000, when the *Gran Tauro* was ordered to return to Buenaventura, and when it was boarded on September 11, 2000, the *Gran Tauro* had traveled only 290 to 300 miles toward Colombia.

At approximately 5:43 a.m., the *De Wert* launched its helicopter to investigate the radar contact merge. The helicopter's

surface radar showed two contacts of interest. The first was a vessel approximately twenty-five nautical miles northeast of the *De Wert*. The helicopter flew in that direction until it determined that the vessel was not the *Gran Tauro*. The helicopter then made a hard right turn and flew in the direction of the second contact, which was approximately eight nautical miles southeast of the *De Wert*. Using the infra-red camera, the helicopter crew determined that the second contact was the *Gran Tauro* sitting dead in the water with its crew milling about on the stern. About three minutes later, the helicopter crew spotted the Go-Fast heading northwest away from the *Gran Tauro*.[5] The helicopter followed the Go-Fast and video-taped its actions with its infra-red camera. At one point, the Go-Fast stopped, as if its crew detected the helicopter's pursuit, and turned back toward the *Gran Tauro*. While being taped, the Go-Fast weaved left and right and jettisoned large bales of cargo.

The Go-Fast traveled erratically toward the *Gran Tauro* until it crashed into the *Gran Tauro*'s stern, causing substantial damage to the Go-Fast. The *Gran Tauro* began to steam away, giving no assistance to the Go-Fast as it began to sink; no one aboard the *Gran Tauro* even came out to the stern of the vessel to see what hit it. Meanwhile, as the Go-Fast began to capsize, its crew stripped themselves naked in an apparent attempt to remove any trace evidence of having handled the cocaine.

### D.    Rescue of the Go-Fast Crew, Scuttling of the Go-Fast, and Recovery of Cocaine and Other Items

The Go-Fast was videotaped as it capsized and as the crew (Defendants Dionasio Aborno ("Aborno"), Abrual Recio Car-

---

[5]The Go-Fast used in this case was of the short-range variety, *see supra* note 2, powered by twin Yamaha 200-hp two-stroke outboard engines. It appeared to have no hull markings designating national origin and did not appear to be flying a flag.

rasco ("Carrasco"), Fernando Lopez ("Lopez"), David Murillo ("Murillo"), and Ferrnei Reina ("Reina")) were rescued from the water by the *De Wert*'s LEDET team and brought aboard the *De Wert*, before being transferred to the custody of the LEDET team aboard the *USS Valley Forge*. Meanwhile, the Go-Fast bobbed in the water, as it was barely able to stay afloat. The crane used for lowering and lifting the boarding boat aboard the *De Wert* could not have been used to salvage the Go-Fast because the Go-Fast was too big, too heavy, and did not have any hoisting points from which to lift it out of the water. Thus, the Go-Fast was destroyed because it was a hazard to navigation and because it held and was surrounded by fuel that could be ignited. In the Go-Fast's debris field were at least a dozen 55-gallon drums riding low in the water, indicating that they were full.

Another LEDET team aboard the *USS Firebolt* assisted in recovering the items jettisoned from the Go-Fast. That team recovered 77 bales of cocaine, a blue 55-gallon fuel drum, and other non-drug evidence. The *De Wert*'s LEDET team also recovered some cocaine. The total cocaine recovered weighed 1,964 kilograms.

### E.  September 11, 2000, Boarding of the *Gran Tauro*

After the Go-Fast crashed into the *Gran Tauro*, the LEDET team aboard the *Valley Forge* contacted the *Gran Tauro* by radio in Spanish. In response, Barnaza indicated that the *Gran Tauro*'s last port-of-call was Buenaventura on August 20, 2000;[6] that the next port-of-call was also to be Buenaventura on or about September 25, 2000; that the cargo aboard was fifteen kilograms of fish; and that there were a total of eight people aboard, all from Colombia. The *Valley Forge* LEDET team, like the *De Wert* LEDET team on September 3, 2000,

---

[6]As noted earlier, the *Gran Tauro*'s *zarpe* indicated that the *Gran Tauro* had actually left Buenaventura on August 25, 2000. *See supra* Part I(A). This discrepancy is not germane to this appeal.

obtained permission from the Colombian government under the Bilateral Agreement to board the *Gran Tauro*.

The LEDET team traveled on its boarding boat in a horseshoe pattern around the *Gran Tauro* to determine whether the vessel had any noticeable safety hazards. Coast Guard Petty Officer Max Seda noticed a strong smell of gasoline coming from the *Gran Tauro*. When the LEDET team came aboard the *Gran Tauro*, it noticed that the vessel's fishing gear was bundled up in front of the crew and that there was a strong smell of gasoline where they stood. When Barnaza turned over the *Gran Tauro*'s documents, he stated that he did not know in which fishing zone he was supposed to be or in which fishing zone, if any, he was at the time of the boarding. Barnaza also said that they had fished only four days and three nights, that they had caught only a little bit of fish, and that the last time that they caught any fish was one week earlier on September 4, 2000. He said that he did not know how to operate the high-frequency radio located in the state room behind the pilot house and indicated that he did not know how to use the boat's GPS. Finally, he said that Audiver was the Administrator of the vessel and the person responsible for giving directions as to where the *Gran Tauro* would travel.

## F.  Pumps and Hoses Aboard the *Gran Tauro*

When asked about the *Gran Tauro*'s gasoline reserves, Marquez told the LEDET team that there were about 200 gallons in the center aft fuel tank and that it was used for the *Gran Tauro*'s bilge pumps. The LEDET team noted that the *Gran Tauro*'s two pumps and generator all had four-stroke, single cylinder engines.[7] The intake and discharge points of one of the pumps, both ends of a hose hooked up to it, and an unattached hose all smelled of gasoline. In an experiment,

---

[7]A four-stroke engine can burn only pure gasoline, whereas two-stroke, outboard motors such as twin Yamahas seen on the Go-Fast burn a gasoline/oil mixture.

the LEDET team moved the pump and hoses near the aft tank and, within two minutes, hooked them up without any help from the *Gran Tauro* crew. The gasoline in the aft tank was approximately three feet from the top, and one of the gas-smelling hoses was long enough to reach the gasoline. From this exercise, Seda concluded that the crew aboard the *Gran Tauro* could use it to refuel other vessels at sea.[8] Marquez denied that the pump had been used to pump gasoline from the aft tank.

### G. Results from Comparison of the Gasoline Aboard the *Gran Tauro* and the Go-Fast's 55-Gallon Drum

Samples were taken from the blue 55-gallon drum recovered from the Go-Fast's debris field. They were compared with samples taken from a similar blue 55-gallon drum aboard the *Gran Tauro* and from the *Gran Tauro*'s aft tank. An expert testified at trial that all the gasoline came from the same source; that all the gasoline contained motor oil; that none of it would be suitable for four-stroke engines like the engines on the *Gran Tauro*'s generator and pumps; but that it would be suitable for two-stroke engines like the twin Yamahas on the Go-Fast. Nor could the gasoline have been used to power the *Gran Tauro* because, as noted earlier, the *Gran Tauro* ran on diesel. From all of this evidence, the Government's expert opined at trial that on September 11, 2000, the *Gran Tauro* was, indeed, an LSV participating in a narcotics-trafficking operation.

## II. PROCEDURAL BACKGROUND

On October 11, 2000, a federal grand jury in the Southern

---

[8]After the *Gran Tauro* was dry-docked in San Diego, California, it was found to contain approximately 1,500 gallons of gasoline — almost 4,500 gallons fewer than found during the September 3, 2000, boarding. This further indicates that the *Gran Tauro* was refueling other vessels while on its voyage.

District of California returned a two-count indictment. Count One charged all the individuals aboard the Go-Fast and the *Gran Tauro* (except the fifteen-year-old juvenile) — Aborno, Audiver, Barnaza, Carrasco, Carvajal, Lopez, Marquez, Murillo, Palacios, Perlaza, Reina, and Sanchez — with conspiracy to possess cocaine with intent to distribute, aboard a vessel, in violation of certain sections of the Maritime Drug Law Enforcement Act ("MDLEA"), 46 App. U.S.C. § 1903(a), (c), and (j). Count Two charged the individuals aboard the Go-Fast — Aborno, Carrasco, Lopez, Murillo, and Reina — with possession of cocaine with intent to distribute, on a vessel, also in violation of the MDLEA — in particular, 46 App. U.S.C. § 1903(a), (c)(1)(A), and (f).

Before trial, Defendants filed various motions, including motions to dismiss the indictment. Relevant to our decision, Defendants sought to dismiss the indictment on the bases

> (1)   that the MDLEA is unconstitutional because it does not require an effect on interstate or foreign commerce; and

> (2)   that the district court lacked jurisdiction over Defendants because the Government did not allege in the indictment that the Go-Fast was stateless and because the Government did not produce any "evidence of nexus at all" between Defendants and the United States.

The district court denied these motions.

On October 18, 2001, Aborno and Reina pled guilty to both counts and were sentenced to 108 and 135 months in custody, respectively. The remaining ten Defendants were convicted on November 9, 2001, after a three-week jury trial. Carrasco, Lopez, and Murillo were convicted of both counts. Audiver, Barnaza, Carvajal, Marquez, Palacios, Perlaza, and Sanchez were convicted of Count One. The district court, Judge

Thomas Whelan presiding, sentenced Carvajal, Palacios, Perlaza, and Sanchez to 135 months in custody; Audiver, Barnaza, and Marquez to 188 months in custody; and Carrasco, Lopez, and Murillo to 200 months in custody. Appeals from all twelve Defendants followed.[9]

## III. DISCUSSION

In their briefs, all of the remaining eleven Defendants raise various challenges to their convictions.[10] Defendants Carrasco and Lopez also raise sentencing issues. After the Supreme Court decided *Blakely v. Washington*, 542 U.S. 296 (2004), and while these consolidated appeals were under submission, all ten of the Defendants who had opted for trial — including

---

[9]Defendant Reina's appeal was severed from these consolidated appeals, and his conviction was affirmed by memorandum disposition. *See United States v. Reina*, 74 Fed. App. 835, 2003 WL 22137240 (9th Cir. Sep. 8, 2003). Thus, these consolidated appeals now consist of only eleven Defendants' cases.

[10]In addition to the grounds discussed in this opinion, the ten Defendants who opted for trial challenge their convictions on the basis that "the Government engaged in outrageous [pretrial] misconduct," such that the district court should have dismissed the indictment under its "inherent supervisory powers."

Gran Tauro Defendant Marquez also challenges his conviction on the basis that certain statements he made during the September 3 and 11, 2000, boardings were obtained in violation of his *Miranda v. Arizona*, 384 U.S. 436 (1966), rights. Go-Fast Defendants Carrasco and Lopez also challenge their convictions on the basis that the district court erred by refusing to sever their trials from the trial of the *Gran Tauro* Defendants, whose defenses, they contend, were antagonistic. Additionally, Lopez argues that the district court's refusal to sever his trial violated his Sixth Amendment Confrontation Clause rights under *Bruton v. United States*, 319 U.S. 123 (1968), and *Crawford v. Washington*, 541 U.S. 36 (2004).

Because these issues are "likely to arise again on remand," *United States v. Smith-Balthier*, 424 F.3d 913, 915 (9th Cir. 2005) (addressing issue not dispositive of appeal but "likely to arise again on remand"), should these Defendants be re-indicted, we have considered their arguments and find them to be without merit.

the eight who did not raise sentencing issues in their opening briefs — filed supplemental papers arguing that *Blakely* rendered their sentences unconstitutional.

Because we find, for the reasons explained below, that the convictions of the ten Defendants who opted for trial cannot stand, their sentencing issues are moot. We begin our analysis with Defendants' challenges to the district court's denial of their motions to dismiss the indictment.

## A. The MDLEA is Constitutional[11]

Before trial, Defendants moved to dismiss the indictment on the basis that the MDLEA is unconstitutional because it fails to require an effect on interstate or foreign commerce. The district court rejected this argument, ruling that the MDLEA was properly enacted under Article I of the Constitution's Piracies and Felonies Clause. *See* U.S. Const., art. I, § 8, cl. 10. Defendants challenge this ruling.

[1] The Constitution empowers Congress "[t]o define and punish Piracies and Felonies on the high Seas, and Offenses against the Law of Nations." U.S. Const., art. I, § 8, cl. 10. Defendants acknowledge that we upheld the MDLEA as a proper exercise of Congress' constitutional power under the Piracies and Felonies Clause in *United States v. Aikins*, 946 F.2d 608 (9th Cir. 1991), and in *United States v. Davis*, 905 F.2d 245 (9th Cir. 1990). Nonetheless, they argue that neither *Aikins* nor *Davis* is binding because neither decision analyzes the scope of the Piracies and Felonies Clause, and thus, both decisions' statements about the constitutionality of the MDLEA are *dicta*. Defendants are incorrect.

*Aikins*' and *Davis*' statements that the MDLEA is constitutional were "necessarily involved in the case[s,] essential to

---

[11]We review the constitutionality of a federal statute *de novo*. *See United States v. McCoy*, 323 F.3d 1114, 1117 (9th Cir. 2003).

[their] determination," and therefore not *dicta*. BLACK'S LAW DICTIONARY 454 (6th ed. 1990); *see also* Bryan A. Garner, A DICTIONARY OF MODERN LEGAL USAGE 274-75 (2d ed. 1995); *accord*, *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1173 (9th Cir. 2004) ("A statement is dictum when it is made during the course of delivering a judicial opinion, but is unnecessary to the decision in the case and is therefore not precedential." (citations, quotations, and alterations omitted)).[12] For example, in *Davis*, the defendant was caught by the Coast Guard approximately 100 miles west of California with over 7,000 pounds of marijuana aboard his vessel. *See* 905 F.2d at 247. Among other things, the defendant argued "that the provisions of the . . . [MDLEA] do not apply to persons on foreign vessels outside the territory of the United States." *Id.* We trifurcated our analysis of the defendant's argument, the first part of which was "whether Congress has constitutional authority to give extraterritorial effect to the [MDLEA]." *Id.* at 248. In answering that question in the affirmative, we noted that "[t]he Constitution gives Congress the power to 'define and punish piracies and felonies on the high seas . . . .' and that the Constitution authorized Congress to give extraterritorial effect to the Act." *Id.* (quoting U.S. Const., art. I, § 8, cl. 10).

Similarly, in *Aikins*, the defendants were caught by the Coast Guard on the high seas southeast of the Hawaiian Islands with approximately 21,000 pounds of marijuana aboard their vessel. *See* 946 F.2d at 611. Among other things, the defendants contended that the MDLEA was unconstitutional as applied to them. *See id.* at 613. At the beginning of

---

[12]What is *dicta* has been the subject of frequent discussion by *en banc* panels of our court. *See, e.g., Barapind v. Enomoto*, 400 F.3d 744 (9th Cir. 2005) (en banc); *Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) (en banc); *Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477 (9th Cir. 1987) (en banc); *United States v. Johnson*, 256 F.3d 895 (9th Cir. 2001) (en banc). We note that, regardless of the characterization of *dicta* that one chooses, neither *Aikins*' nor *Davis*' finding that the MDLEA is constitutional is *dicta*. *Compare Barapind*, 400 F.3d at 751, *with id.* at 758 (Rymer, J., dissenting).

our "as applied" analysis, we noted that "[i]t has been established that the Act is intended by Congress to apply to conduct on the high seas" and that "[i]t is clear that Congress has power 'to define and punish piracies and felonies committed on the high seas.' " *Id.* (citing U.S. Const., art. I, § 8, cl. 10; *Davis*, 905 F.2d at 248).

Moreover, even if our statements in *Aikins* and *Davis* were *dicta*, in *United States v. Moreno-Morillo*, 334 F.3d 819 (9th Cir. 2003), *cert. denied*, 540 U.S. 1156 (2004), decided after the majority of the briefs were filed in this case, we adopted *Aikins*' and *Davis*' discussions of the constitutionality of the MDLEA. In *Moreno-Morillo*, we held that "Congress . . . was acting within its constitutionally conferred authority when it passed the MDLEA. That authority is expressly conferred by Article I, Section 8, Clause 10 [the Piracies and Felonies Clause] . . . ." 334 F.3d at 824-25; *see also United States v. Ledesma-Cuesta*, 347 F.3d 527, 532 (3d Cir. 2003) ("Congress had authority to enact [the MDLEA], pursuant to its constitutional power to: 'define and punish Piracies and Felonies committed on the high seas, and Offenses against the Law of Nations.' Inasmuch as the trafficking of narcotics is condemned universally by law-abiding nations, we see no reason to conclude that it is 'fundamentally unfair' for Congress to provide for the punishment of persons apprehended with narcotics on the high seas." (quoting *United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3d Cir. 1993))).

**[2]** Binding precedent compels us to find that the MDLEA is constitutional under the Piracies and Felonies clause and to reject Defendants' constitutional challenge to it.

### B.    The District Court Erred when It Concluded that It Had Jurisdiction over the Defendants[13]

---

[13]We review questions of law, such as the MDLEA's jurisdictional requirements, *de novo*. *See United States v. Bynum*, 327 F.3d 986 (9th Cir.) (reviewing *de novo* the district court's construction of jurisdictional elements of 18 U.S.C. § 666, the federal statute proscribing "theft or bribery concerning programs receiving Federal funds"), *cert. denied*, 540 U.S. 908 (2003).

Before trial, Defendants also moved to dismiss the indictment on the basis that the district court lacked jurisdiction over them because the Government did not allege in the indictment that the Go-Fast was stateless and because the Government did not produce any "evidence of nexus at all" between Defendants and the United States. The district court rejected these arguments and found that it had jurisdiction over Defendants. This was error.

**[3]** The MDLEA prohibits possession, manufacture, or distribution of illicit drugs aboard a "vessel subject to the jurisdiction of the United States." 46 App. U.S.C. § 1903(a). A "vessel subject to the jurisdiction of the United States" is defined as either (1) a vessel without nationality (also commonly referred to as a stateless vessel); (2) a vessel assimilated to a vessel without nationality; (3) a vessel registered in a foreign nation where the nation of registration consents to the United States' enforcement of its laws aboard that ship; (4) a vessel located in the customs waters of the United States; or (5) a vessel located in the territorial waters of another nation where that nation consents to enforcement of United States laws by United States authorities. *See id.* § 1903(c). For the Government to prosecute someone under the MDLEA, the Government must satisfy at least one of these "statutory jurisdiction" requirements. *United States v. Medjuck* ("*Medjuck III*"), 156 F.3d 916, 918 (9th Cir. 1998).

**[4]** In addition to the MDLEA's "statutory jurisdiction" requirements, where the MDLEA is being applied extraterritorially, as in this case, due process requires the Government to demonstrate that there exists "a sufficient nexus between the conduct condemned and the United States" such that the application of the statute would not be arbitrary or fundamentally unfair to the defendant. *United States v. Medjuck* ("*Medjuck II*"), 48 F.3d 1107, 1111 (9th Cir.1995); *see also Moreno-Morillo*, 334 F.3d at 828; *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1256-59 (9th Cir. 1998); *United States v. Khan*, 35 F.3d 426, 429-30 (9th Cir. 1994);

*Davis*, 905 F.2d at 248-49; *United States v. Peterson*, 812 F.2d 486, 493 (9th Cir. 1987).[14] There is one exception, however, to this "constitutional jurisdiction" requirement: "[i]f a vessel is deemed stateless, there is no requirement that the government demonstrate a nexus between those on board and the United States before exercising jurisdiction over them." *Moreno-Morillo*, 334 F.3d at 829; *see also United States v. Caicedo*, 47 F.3d 370, 372-73 (9th Cir. 1995).

In this case, the district court determined that both the statutory and constitutional jurisdiction questions were questions for the court — not the jury — to decide. With respect to the Go-Fast Defendants, the district court found that it had statutory jurisdiction because, after conducting evidentiary hearings, it determined that the Go-Fast was a stateless vessel. Because it deemed the Go-Fast stateless, the district court found that the Government was not required to establish constitutional jurisdiction by showing a nexus between the Go-Fast and the United States. With respect to the *Gran Tauro* Defendants, the district court found that it had statutory jurisdiction because it determined that the *Gran Tauro* was a Colombian-registered vessel and that the Colombian government had consented to the United States' enforcement of its laws aboard that ship.

Although nexus is ordinarily required for foreign-flagged vessels like the *Gran Tauro*, the district court found that the Government need not show nexus between the *Gran Tauro* Defendants and the United States. Specifically, the district court found that the *Gran Tauro* Defendants were aiding and abetting the Go-Fast Defendants and, as aiders and abettors, "stand in the shoes of the principals, specifically the Go-Fast defendants, for jurisdiction purposes." Because the district

---

[14]Other circuits do not require a "nexus." *See United States v. Suerte*, 291 F.3d 366, 375 (5th Cir. 2002); *United States v. Perez-Oviedo*, 281 F.3d 400, 403 (3d Cir. 2002); *United States v. Cardales*, 168 F.3d 548, 553 (1st Cir. 1999) (Hall, J., sitting by designation).

court had previously found that the Go-Fast was stateless and that the district court had jurisdiction over the Defendants aboard it, the district court concluded that it also had jurisdiction over the *Gran Tauro* Defendants and that the Government need not demonstrate a nexus between the *Gran Tauro* and the United States.

Defendants challenge all of these rulings. As a threshold matter, the Government contends that we need not evaluate Defendants' challenges to these rulings because the district court properly exercised jurisdiction over Defendants under the "drug trafficking protective principle" and the United States' "universal jurisdiction" to prevent piracy, slave trading, and other universally condemned activities. Accordingly, before considering the merits of Defendant's challenges to the district court's statutory and constitutional jurisdiction analyses, we consider the "protective principle" and "universal jurisdiction."

### 1. The "Protective Principle" and "Universal Jurisdiction"

Our circuit has recognized the "protective principle"[15] as part of its consideration of whether nexus exists, not as a substitute for it. We first discussed the "protective principle" in *Peterson*, where we stated that

> drug trafficking may be prevented under the protective principle of jurisdiction, without any showing of

---

[15]As recognized by the Second Circuit, under the "protective principle,"

a state "has jurisdiction to prescribe a rule of law attaching legal consequences to conduct outside its territory that threatens its security as a state or the operation of its governmental functions, provided the conduct is generally recognized as a crime under the law of states that have reasonably developed legal systems."

*United States v. Pizzarusso*, 388 F.2d 8, 10-11 (2d Cir. 1968) (quoting Restatement (Second), Foreign Relations § 33 (1965)).

an actual effect on the United States. Protective jurisdiction is proper if the activity threatens the security or governmental functions of the United States. Drug trafficking presents the sort of threat to our nation's ability to function that merits application of the protective principle of jurisdiction.

812 F.2d at 493 (citations omitted).

There are limitations, however, to *Peterson*'s discussion of the "protective principle." First, the language in *Peterson*, quoted above, concerning the "protective principle" is *dicta*. It was "unnecessary to the decision of the case and . . . therefore not precedential," *Cetacean Cmty.*, 386 F.3d at 1173, because, in that case, "there was more than a sufficient nexus with the United States to allow exercise of jurisdiction," *Peterson*, 812 F.2d at 493.

Second, the notion that *Peterson*'s "protective principle" can be applied to "prohibiting foreigners on foreign ships 500 miles offshore from possessing drugs that . . . might be bound for Canada, South America, or Zanzibar" — as suggested by the Government here — has been repeatedly called into question by our Court and others. *United States v. Robinson*, 843 F.2d 1, 3 (1st Cir. 1988) (Breyer, J.) (questioning the reasonableness of a broad reading of the "protective principle" because such a broad reading would allow the United States to police any international conduct "against [any] important state interests"); *see also, e.g., Davis*, 905 F.2d at 248-49 & n.2; *United States v. Suerte*, No. CRIM. 00-0069, 2001 WL 1877264, *6 (S.D. Tex. June 6, 2001), *vacated on other grounds*, 291 F.3d 366 (5th Cir. 2002); *United States v. Juda*, 797 F. Supp. 774, 777 (N.D. Cal. 1992) ("*Juda I*"), *aff'd*, 46 F.3d 961 (9th Cir. 1995) ("*Juda II*"). For example, in *Davis*, we noted that "[i]nternational law principles," such as the "protective principle,"

> may be useful as a *rough guide* of whether a sufficient nexus exists between the defendant and the

United States so that application of the statute in question would not violate due process. However, danger exists that emphasis on international law principles will cause us to lose sight of the ultimate question: would application of the statute to the defendant be arbitrary or fundamentally unfair?

902 F.2d at 249 n.2 (emphasis added) (citing *Peterson*, 812 F.2d at 493).

Third, application of *Peterson*'s "protective principle" without a showing of nexus or statelessness would nullify 46 App. U.S.C. § 1903(c) and a wealth of our MDLEA opinions requiring nexus or statelessness for the United States to have jurisdiction over drug smugglers captured on the high seas. *See, e.g., Moreno-Morillo*, 334 F.3d at 827-28; *Juda II*, 46 F.3d at 965-66; *Aikens*, 923 F.2d at 655; *Davis*, 905 F.2d at 249.[16]

The Government also argues that the district court properly found that it had jurisdiction over the Go-Fast defendants under the "universal jurisdiction" to prevent piracy, slave trade, and universally condemned activity. This argument is simply a weaker version of the Government's "protective principle" argument that differs only inasmuch as it rests exclusively on two Eleventh Circuit cases: *United States v. Marino-Garcia*, 679 F.2d 1373, 1382 n.16 (11th Cir. 1982) (noting "a growing consensus among nations to include drug trafficking as a universally prohibited crime"), and *Gonzalez*, 776 F.2d at 939-40 (citing *Marino-Garcia* for the proposition that "conduct may be forbidden if it has a potentially adverse

---

[16]Indeed, as Northern District of California Judge Charles Legge concluded, "Based upon the *Davis* court's discussion on pp. 248-49, and particularly footnote 2 . . . the circuit has rejected the protective principle discussed in *Peterson* . . . as being an independent ground for jurisdiction, and instead requires a constitutionally sufficient nexus." *Juda I*, 797 F. Supp. at 777.

effect and is generally recognized as a crime by nations that have reasonably developed legal systems").

[5] For these reasons, we reject the Government's contention that either the "protective principle" or "universal jurisdiction" vitiated its obligation to establish statutory and constitutional jurisdiction over Defendants. Thus, we now consider whether the district court properly concluded that it had statutory jurisdiction over Defendants.

## 2. Statutory Jurisdiction

[6] "Prior to 1996, there was a consensus among the circuits that 'the jurisdictional requirement in section 1903(a) is an element of the crime charged and therefore must be decided by the jury.' " *Moreno-Morillo*, 334 F.3d at 828 (quoting *Medjuck II*, 48 F.3d at 1110 (citing cases from the First, Third, and Eleventh Circuits)). In 1996, Congress amended § 1903 by adding a new subsection (f), which provides that "[j]urisdiction of the United States with respect to vessels subject to this chapter is not an element of any offense" and that "[a]ll jurisdictional issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge." 46 App. U.S.C. § 1903(f). In doing so, Congress' goal was to "expand the Government's prosecutorial effectiveness in drug smuggling cases." H.R. Conf. Rep. 104-854, at 142 (1996), reprinted in 1996 U.S.C.C.A.N. 4292, 4337; *see also* 32 Weekly Comp. Pres. Doc. 2212 (Oct. 28, 1996) (signing statement of President Clinton) (noting that the general purpose of the amendment was to "strengthen [ ] the hand of prosecutors in drug smuggling cases").

Defendants argue that, notwithstanding Congress' addition of subsection (f), whether they were "on board . . . a vessel subject to the jurisdiction of the United States" remains an element of an MDLEA offense and must be submitted to the jury because subsection (f) is unconstitutional under the Fifth

Amendment's Due Process Clause and the Sixth Amendment's right to trial by jury.

Very few courts have analyzed the effect of § 1903(f) — much less, the effect of 1903(f) in light of the Fifth and Sixth Amendments. In *United States v. Tinoco*, 304 F.3d 1088, 1106-12 (11th Cir. 2002), the Eleventh Circuit held that whether a vessel is subject to the jurisdiction of the United States under § 1903(f) is an issue for only the judge to decide. According to the Eleventh Circuit, "statutory jurisdiction" is no longer an element of an MDLEA offense, and, therefore, whether a vessel is subject to the jurisdiction of the United States need not be determined by a jury. *See id.*; *see also United States v. Bustos-Useche*, 273 F.3d 622, 625-26 (5th Cir. 2001) (defendant's guilty plea did not waive challenge to jurisdiction because, under § 1903(f), jurisdiction is no longer an element of the crime to be found by a jury); *but cf. United States v. Gonzalez*, 311 F.3d 440, 442-44 (1st Cir. 2002) (holding that defendant's guilty plea did waive objection to jurisdiction over the vessel, but not reaching the question whether jurisdiction over the vessel must be decided by a jury after § 1903(f)).

We have considered the effect of subsection (f) in two cases: *United States v. Smith*, 282 F.3d 758 (9th Cir. 2002), and *Moreno-Morillo*. Neither case decides the precise question presented here, although *Smith* (as interpreted by *Moreno-Morillo*) supports Defendants' arguments.[17]

The defendants in *Smith* were arrested on a vessel allegedly in United States customs waters. *See* 282 F.3d at 767. In that case, the district court concluded that under § 1903(f), the court, not the jury, should decide *both* (1) whether the United States has jurisdiction over the place where the vessel was allegedly intercepted (*i.e.,* in *Smith*, if the place where the ves-

---

[17]We recognize that the district court was without the benefit of *Smith* or *Moreno-Morillo* when it decided the jurisdictional issues in this case.

sel was allegedly intercepted was within United States customs waters); and (2) whether the vessel was actually intercepted at that place. *See id.* at 766. We rejected the district court's interpretation as "over-inclusive," finding that "[s]ection 1903(f) empowers the court to make only the former determination; the latter question, as to where the vessel was intercepted, is a question of fact to be decided by the jury." *Id.*

In *Moreno-Morillo*, we read *Smith* as having narrowed the effect of § 1903(f) to apply to only purely legal questions while reserving factual questions for the jury. *See* 334 F.3d at 829-30. The Eleventh Circuit has also described *Smith*'s holding this way: "Generally speaking, the Ninth Circuit's interpretation of § 1903(f) suggests that particularized, case-specific factual determinations that have to be made as part of the MDLEA jurisdictional inquiry are to be decided by the jury." *Tinoco*, 304 F.3d at 1111 n.22 (discussing *Smith*).

**[7]** In *Moreno-Morillo*, as in this case, statutory jurisdiction depended not on the factual determination of where the vessel was seized, as in *Smith*, but, rather, on the ship's nationality — in particular, whether the vessel was stateless. *See Moreno-Morillo*, 334 F.3d at 829. The problem with *Smith*, as we explained in *Moreno-Morillo*, is that not all jurisdictional determinations under § 1903 may be split so easily into two questions — one of which is purely legal and, under § 1903(f), is decided by the court, and the other, which is factual, is left for the jury. *See id.* at 829. For example, where jurisdiction, as in this case, turns on a vessel's nationality or statelessness, there is only *one* question to be answered:

> [A] determination [of jurisdiction in a statelessness case], unlike that faced by this court in *Smith*, a customs waters case, cannot be separated neatly into two parts. Here, jurisdiction depends not on the ship's location (*e.g.*, "the waters where a vessel is allegedly intercepted," *Smith*, 282 F.3d at 767), but

rather upon its status: Either the Defendants' ship is stateless or it is not.

*Id.*

Ultimately, in *Moreno-Morillo*, we concluded that we need not resolve whether a judge or jury should decide a vessel's nationality or statelessness.[18] *Id.* at 830. The day for deciding the issue, however, is now upon us.

Here, there is no dispute that the *Gran Tauro* was a Colombian flagged vessel for purposes of § 1903. The status of the Go-Fast, however, is disputed. The Government may prove that the Go-Fast was stateless in any one of three ways: (1) by proving that a claim of registry was denied by the claimed nation; (2) by proving that the master or person in charge failed, when asked, to make a claim of nationality or registry; or (3) by proving that the master or person in charge made a claim of registry but that the claimed nation did not "affirmatively and unequivocally" confirm the vessel's nationality. 46 App. U.S.C. § 1903(c)(2).

Three Navy personnel who observed the Go-Fast through binoculars from the *De Wert*'s bridge or with the *De Wert*'s

---

[18]With respect to one of the *Moreno-Morillo* defendants, we held that the defendant waived his right to challenge § 1903(f) because the issue "ha[d] not been properly preserved under the terms of his plea agreement." 334 F.3d at 825. With respect to the remaining three *Moreno-Morillo* defendants, we avoided the issue by finding that the district court had made only a preliminary determination of statelessness on uncontested facts in order to determine whether the court had personal jurisdiction. *Id.* at 830-31 (where defendants failed to challenge substance of State Department certificate noting that Colombia would neither affirm nor deny vessel's registry, "the substance of that certificate stands as the only — and therefore uncontroverted — evidence in the record regarding statelessness"). The district court had not necessarily taken the ultimate question of statelessness away from the jury, and the defendants pled guilty, so the case never proceeded far enough for the district court to revisit the issue. *See id.*

helicopter's infra-red camera testified at the district court's evidentiary hearing that they saw no flags of any kind, no markings of any kind, no hull numbers, no name on the boat, and no home-port inscription. Additionally, when Coast Guard Petty Officer Craig Cruz asked the Go-Fast Defendants if the vessel had a flag, Reina and Murillo simply shook their heads back and forth, and Aborno stated, "Barco no tengo bandera," which literally means, "Boat I have no flag." On the other hand, Reina and Murillo both submitted declarations stating that they were "from" Colombia and that the Go-Fast was "from" Colombia. This could be read fairly as a statement of nationality.

At the evidentiary hearing, Petty Officer Cruz also testified that later, when asked who was in charge of the Go-Fast, Murillo stated that Go-Fast's captain was a person named "Freddy," who was never found and, according to Cruz's report, "was the only one who really knew about the boat expedition." Although the district court indicated that this statement was not produced for its truth — namely, that "Freddy" was in fact the Go-Fast's captain — the statement indicates that, when Cruz inquired as to who was the Go-Fast's captain, neither Murillo nor Reina claimed to be its master or the person in charge. On the other hand, Reina and Murillo may nonetheless have been in charge of the Go-Fast at the time because "Freddy" was never found by the LEDET teams investigating the *Gran Tauro* and the Go-Fast. Additionally, the Government also appears to have treated Reina and Murillo as persons in charge by asking them about the Go-Fast's nationality.

[8] After hearing all the evidence as to its status at a pretrial hearing, the district court determined that the Go-Fast was a stateless vessel. We find that by not submitting this issue to the jury, the district court erred. The evidence relating to the Go-Fast's statelessness presents precisely the kind of disputed factual question that *Smith* requires a jury to resolve.[19]

---

[19]Our dissenting colleague's assertion that "the Go-Fast's status was a question for the court, not the jury," is dependent on *his* finding that "the

*Cf. Brosseau v. Haugen*, 543 U.S. 194, 206 (2004) (Stevens, J., dissenting) ("This is a quintessentially 'fact-specific' question, not a question that judges should try to answer 'as a matter of law.' "). "[C]ase-specific factual determinations that have to be made as part of the MDLEA jurisdictional inquiry are to be decided by the jury." *Tinoco*, 304 F.3d at 1111 n. 22 (discussing *Smith*).[20]

Notwithstanding the statutory language of § 1903(f) and Congress' prerogative in enacting the law of federal crimes, *see Staples v. United States*, 511 U.S. 600, 604 (1994), we are

_____

evidence presented with regard to the Go-Fast's status is . . . uncontroverted." Dissent at 2624; *see also id.* at 2626 ("Since no evidence was presented to create a factual dispute with regard to the Go-Fast's status as a 'vessel without nationality,' under *Moreno-Morillo*, the district court properly determined that the vessel was stateless based on the uncontrovered evidence in the record."). For the reasons already explained above, we disagree with this reading of the evidence.

Accordingly, contrary to our dissenting colleague's assertion, *see id.* at 2623-24, the inquiry required to resolve the tension in these facts issue is necessarily closer to the type of dispute that *Smith* required the *jury* to resolve — *i.e.*, whether the vessel was in fact intercepted at the location alleged by the Government — rather than the legal question that *Smith* required the *judge* to resolve — *i.e.*, whether the United States had jurisdiction over the waters where the vessel was in fact intercepted, *see* 282 F.3d at 766.

[20]The Government bears the burden of proving statelessness. *See Tinoco*, 304 F.3d at 1114 ("[W]e note that the government bears the burden of establishing that the statutory requirements of subject matter jurisdiction imposed by the MDLEA have been met."); *cf. Medjuk III*, 156 F.3d at 918 (stating that the government must demonstrate "nexus"). This approach to the burdens of proof is consistent with the general rule that the party invoking a federal court's jurisdiction bears the burden of proving that all of the requirements for the exercise of jurisdiction have been met. *See Hunter v. United Van Lines*, 746 F.2d 635, 639 (9th Cir. 1984) ("We . . . note that the burden of establishing federal jurisdiction falls on the party who invokes the removal statute."); *see also LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1152 (9th Cir. 2000) ("As the party seeking to invoke federal jurisdiction, LSO bears the burden of establishing its standing.").

mindful that we must honor the strictures of the Fifth and Sixth Amendments. Thus, this case presents one of the "limited circumstances" in which "facts not formally identified as elements of the offense charged" must be submitted to the jury and proved beyond a reasonable doubt. *McMillan v. Pennsylvania*, 477 U.S. 79, 85 (1986). This is because "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); *see also Harris v. United States*, 536 U.S. 545, 561 (2002) (defining "elements" as " 'fact[s] . . . legally essential to the punishment to be inflicted.' " (quoting *United States v. Reese*, 92 U.S. 214, 232 (1876) (Clifford, J., dissenting))). "It is equally clear that the 'Constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements of the crime with which he is charged.' These basic precepts, firmly rooted in the common law, have provided the basis for recent decisions interpreting modern criminal statutes . . . ." *United States v. Booker*, 125 S. Ct. 738, 748 (2005) (quoting *United States v. Gaudin*, 515 U.S. 506, 511 (1995)).

Consistent with these precepts, the Supreme Court has recently admonished that "Congress may not manipulate the definition of a crime in a way that relieves the Government of its constitutional obligations to charge each element in the indictment, submit each element to the jury, and prove each element beyond a reasonable doubt." *Harris*, 536 U.S. at 556 (citing *Jones v. United States*, 526 U.S. 227, 240-41 (1999); *Mullaney v. Wilbur*, 421 U.S. 684, 699 (1975)); *see also Ring v. Arizona*, 536 U.S. 584, 606-07 (2002) ("In various settings, we have interpreted the Constitution to require the addition of an element or elements to the definition of a criminal offense in order to narrow its scope. If a legislature responded to one of these decisions by adding the element we held constitutionally required, surely the Sixth Amendment guarantee would apply to that element." (internal citations omitted)). But that is precisely what Congress did with respect to § 1903. In

adding subsection (f), it essentially overrode by statute the consensus prevailing at that time that juries, not judges, would decide whether § 1903(a)'s jurisdictional requirement was satisfied. *See* Coast Guard Authorization Act of 1996, Pub. L. 104-324, § 1138(a)(5), 110 Stat. 3901 (1996).

**[9]** When that jurisdictional inquiry turns on "factual issue-[s]," such as the question "where the vessel was intercepted" in *Smith*, 282 F.2d at 767, or in this case, whether the Go-Fast was stateless, the jurisdictional inquiry *must* be resolved by a jury. Accordingly, we must vacate Go-Fast Defendants Carrasco's, Lopez's, and Murillo's convictions and direct the district court to dismiss the indictment against them.[21]

---

[21]Even though Defendant Aborno pled guilty unconditionally, he asserts that his conviction must be reversed because the MDLEA violates the Fifth and Sixth Amendments by removing the jurisdictional inquiry from the jury. Ordinarily, in this circuit, "[c]laims that 'the applicable statute is unconstitutional or that the indictment fails to state an offense' are jurisdictional claims not waived by the guilty plea." *United States v. Montilla*, 870 F.2d 549, 552 (9th Cir. 1989) (quoting *United States v. Broncheau*, 597 F.2d 1260, 1262 n.1 (9th Cir. 1979)), *amended by* 907 F.2d 115 (9th Cir. 1990); *see also United States v. Lopez-Armenta*, 400 F.3d 1173, 1175 (9th Cir. 2005) ("[I]t is well-settled that an unconditional guilty plea constitutes a waiver of the right to appeal all *nonjurisdictional* antecedent rulings and cures all antecedent constitutional defects." (emphasis added) (citing *United States v. Floyd*, 108 F.3d 202, 204 (9th Cir. 1997); *United States v. Cortez*, 973 F.2d 764, 766 (9th Cir. 1992))). Nonetheless, Aborno's argument is foreclosed by *Moreno-Morillo*, where we held that "claim[s] that the MDLEA violates the Fifth and Sixth Amendments because it removes from the jury an element of the offense" must be expressly reserved for appeal. 334 F.3d at 825-26 (citing *United States v. Chon*, 210 F.3d 990, 995 (9th Cir. 2000)); *cf. Gonzalez*, 311 F.3d at 444 (holding that an MDLEA defendant who unconditionally pleads guilty forfeits his right to challenge the district court's jurisdiction on appeal). Accordingly, our reversal of the Go-Fast Defendants' convictions and dismissal of the indictment against them on the basis that the Go-Fast's nationality must be proved to a jury do not apply to Aborno.

In addition, on October 6, 2003, Aborno attempted to expand the scope of his appeal when he filed a motion to join in the challenges raised by his co-Defendants. On October 23, 2003, a motions and screening panel

On remand, should the Government re-indict Go-Fast Defendants Carrasco, Lopez, and Murillo, and should a jury conclude that the Go-Fast was stateless, the district court's jurisdictional inquiry with respect to them will be complete because, as we noted earlier, "[i]f a vessel is deemed stateless, there is no requirement that the government demonstrate a nexus between those on board and the United States before exercising jurisdiction over them." *Moreno-Morillo*, 334 F.3d at 829; *see also Caicedo*, 47 F.3d at 372-73. In contrast, should a jury conclude on remand that the Go-Fast was Colombian, the district court will, consistent with the principles outlined in the following section, have to determine whether the Government established a sufficient nexus between the Go-Fast and the United States.

### 3. Constitutional Jurisdiction

As noted earlier, in addition to establishing a statutory basis for jurisdiction over foreign-flagged vessels, we also require a showing of nexus between the prohibited activity and the United States. *See Medjuck III*, 156 F.3d at 918. "The nexus requirement is a judicial gloss applied to ensure that a defendant is not improperly haled before a court for trial . . . . [It] serves the same purpose as the 'minimum contacts' test in personal jurisdiction." *Moreno-Morillo*, 334 F.3d at 830 n.8 (quoting *Klimavicius-Viloria*, 144 F.3d at 1257). As we noted above, the nexus requirement turns on the status of the vessel: "With respect to those apprehended aboard foreign-flagged vessels, there must be some nexus to the United States before jurisdiction can be established . . . ." *Id.* at 828; *see also*

of our Court referred Aborno's motion to this merits panel for resolution. In light of the precedents cited in the preceding paragraph, we deny Aborno's motion to join in the challenges raised by his co-Defendants with respect to all issues except their challenge to Congress' power to enact the MDLEA. Having already decided that issue against Defendants, and it being Aborno's only challenge to his conviction properly before us, his conviction must be affirmed.

*Klimavicius-Viloria*, 144 F.3d at 1257 ("A defendant on [a foreign-flagged ship] would have a legitimate expectation that because he has submitted himself to the laws of one nation [the foreign-flag nation], other nations will not be entitled to exercise jurisdiction without some nexus." (citation omitted)).

**[10]** The *Gran Tauro* was, without dispute, a Colombian vessel, and the Colombian government gave the *De Wert*'s and *Valley Forge*'s LEDET teams telephonic consent under the Bilateral Agreement to board the *Gran Tauro*. This satisfied the Government's statutory jurisdiction obligations under § 1903(c). *See* 46 App. U.S.C. § 1903(c)(1) ("[A] 'vessel subject to the jurisdiction of the United States' includes . . . a vessel registered in a foreign nation where the flag nation has consented or waived objection to the enforcement of United States law by the United States . . . . Consent or waiver of objection by a foreign nation . . . may be obtained by radio, telephone, or similar oral or electronic means . . . ."). Under such circumstances, however, and as we noted above, our case law requires the Government to *also* show nexus between the prohibited activity and the United States.

**[11]** Here, the district court concluded that the Government need not show nexus as to the *Gran Tauro* because the *Gran Tauro* aided and abetted the Go-Fast, over which the district court already concluded that it had jurisdiction by virtue of the Go-Fast's statelessness. The district court's conclusion that the Government need not show nexus as to the *Gran Tauro* was erroneous.

First, the district court's ruling as to the *Gran Tauro* cannot stand because we have already reversed the antecedent ruling on which it relied — namely, that the Go-Fast was stateless. But even if we had affirmed the district court's ruling that the Go-Fast was stateless, we would still reverse its ruling as to the *Gran Tauro*.

Relying on the theory of aiding and abetting does not vitiate the need to consider the underlying bases for jurisdiction.

In *Klimavicius-Viloria*, we noted that criminal liability under the MDLEA could be predicated on an aider-and-abettor theory, but we conducted a nexus analysis nevertheless. *See Klimavicius-Viloria*, 144 F.3d at 1257. Aiding and abetting is a substantive area of criminal law that allows courts to punish vicariously a defendant who, in some way, associates himself with an illegal venture, participates in it as in something he wishes to bring about, and seeks by his actions to make it succeed. *Id.* at 1263 (citing *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)). The ability of a United States court to exercise jurisdiction over that particular defendant, however, is a preliminary determination totally distinct from the crime itself and must be considered before any United States court or jury may determine whether the defendant acted as a principal or an aider and abettor. *See id.* at 1257.

[12] The fact that the Government received Colombia's consent to seize the members of the *Gran Tauro*, remove them to the United States, and prosecute them under United States law in federal court does not eliminate the nexus requirement. The consent permitted the United States to prosecute defendants under United States law — nothing more. *See id.* at 1256-57 (conducting nexus analysis despite Panama's consent to United States to seize the Panamanian-flagged vessel and the contraband, arrest the crew, and prosecute under United States law). For a United States court to properly exercise jurisdiction, the Government still needs to establish some detrimental effect within, or nexus to, the United States. *Cf. United States v. Hill*, 279 F.3d 731, 739 (9th Cir. 2002) ("Under the territorial jurisdiction theory, jurisdiction is appropriate if the acts performed outside the United States produce detrimental effects within the United States."); *United States v. Felix-Gutierrez*, 940 F.2d 1200, 1205-06 (9th Cir. 1991) (holding that accessory-after-the-fact liability can attach extraterritorially if the underlying statute was intended to reach extraterritorially, but international law jurisdictional limits still apply). Until nexus is established, we cannot apply United States aiding-and-abetting law, and, by

applying it in lieu of holding the Government to its obligation to establish nexus, the district judge put the proverbial cart before the horse.

**[13]** Nor can we find that the district court's failure to require the Government to establish nexus was harmless because, here, the Government conceded at oral argument before us that it did not present any evidence indicating that the cocaine jettisoned from the Go-Fast had any nexus to the United States. Thus, the district court erred in exercising jurisdiction over the *Gran Tauro* Defendants, who were members of an undisputably foreign-flagged vessel. Because nexus is an essential part of the jurisdictional analysis that our case law requires, we reverse the *Gran Tauro* Defendants' convictions and direct the district court to dismiss the indictment against them.

### C. The Government Committed Prosecutorial Misconduct Sufficient to Warrant Reversal of Defendants' Convictions[22]

The ten Defendants who opted for trial contend that the Government committed prosecutorial misconduct on multiple occasions throughout their trial. We need not consider each alleged instance of prosecutorial misconduct because we find that one of them in particular is a sufficient alternative basis to warrant reversal of the convictions of the ten Defendants who opted for trial.

At the close of Defendants' three-week trial, the Prosecutor made the following statement in his rebuttal argument:

> [I]n a short period of time, the case will be handed to you. You're going to go back into that delibera-tion room and that presumption of innocence, that

---

[22]We review whether closing argument constitutes misconduct *de novo*. *See United States v. Santiago*, 46 F.3d 885, 892 (9th Cir. 1995).

presumption of innocence that these men have all been cloaked with for the last year, the last year while we've litigated motions — you've heard about all the motions that have been held beforehand. That's why it's taken so long to get here. That presumption, when you go back in the room right behind you, is going to vanish when you start deliberating. *And that's when the presumption of guilt is going to take over you . . . .* [interrupted by objection]

Defendants' counsel responded to this statement with a flurry of objections, all of which the district judge overruled. Immediately after the court overruled the objections, one of Defendants' counsel made the following additional comment: "That's misconduct. There is no presumption of guilt" and "I move for mistrial," to which the district court responded, "*That's proper rebuttal. Go ahead. You are all right.*" Defense counsel finished by stating, "Presumption of guilt can't be proper, Your Honor." The Prosecutor continued with his remarks,[23] which lasted approximately twenty pages of transcript until a break in the proceedings allowed counsel and the district judge to discuss more fully the Prosecutor's statement.

Defense counsel forcefully argued that, not only was the Prosecutor's statement a misstatement of law, but it constituted prosecutorial misconduct. Defense counsel asserted that they did not believe that a curative instruction could cure the prejudice suffered by the defendants from this remark; however, one of Defendants' counsel stated,

But I think that if Your Honor is going to give one,

---

[23]During this sequence of rebuttal, the Prosecutor attempted to give his own "curative instruction," stating that the Defendants had nothing to prove and that it was the Government's burden to prove its case beyond a reasonable doubt.

as we are bound to request under the Ninth Circuit, it should be something along the lines of: that was absolute misconduct by the prosecutor, it was inexcusable, and there is no — and then instruct them on the correct law, which is the presumption of innocence applies unless and until it is disproven and that there is no presumption of guilt.

When given the opportunity to respond, the Prosecutor confirmed that his statement was intentional: "That's what I said, when they get back there and start looking at it is when the presumption takes over, presumption of guilt."

The district court concluded that the Prosecutor's statement did not constitute misconduct and denied the motion for mistrial but agreed to give a curative instruction. After the break, the court allowed the Prosecutor to continue without making any statement to the jury, and only after the Prosecutor finished his rebuttal arguments — this time, about thirty-six transcript pages later — did the district court give the following instruction:

> [I]t is my duty at this time to instruct you on the law that applies in this case . . . . Also, I'm sure you're all aware of this, but let me just tell you this before we begin. There is no such thing as a presumption of guilt in a criminal case. All defendants in a criminal case are presumed to be innocent unless or until such time as the evidence establishes their guilt.

The court continued with its instructions, stating that "the defendants are presumed to be innocent," "the government has the burden of proof of proving every element of each charge beyond a reasonable doubt," and "[n]o presumption of guilt may be raised and no inference of any kind may be drawn from the fact that a defendant did not testify." The court then provided a fairly comprehensive explanation of the legal standard for proof beyond a reasonable doubt.

Defendants argue that the Government's "presumption of guilt" comment impermissibly shifted the burden of proof to the defense. The Government concedes in its Answering Brief that the comment was improper but argues that it was harmless and cured by the district court's curative instruction and repeated instructions on the burden of proof. So too does our dissenting colleague. *See* Dissent at 2628. We disagree.

**[14]** Criminal defendants have a constitutional right to the presumption of innocence and to have the government prove guilt beyond a reasonable doubt. *Estelle v. Williams*, 425 U.S. 501, 503 (1976) ("The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment. The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." (citation omitted)); *In re Winship*, 397 U.S. 358, 362 (1970) ("[I]t [is] the duty of the Government to establish . . . guilt beyond a reasonable doubt. This notion — basic in our law and rightly one of the boasts of a free society — is a requirement and a safeguard of due process of law in the historic, procedural content of 'due process.' " (quoting *Leland v. Oregon*, 343 U.S. 790, 802-03 (Frankfurter, J., dissenting))).[24]

---

[24]*See also United States v. Gaudin*, 515 U.S. 506, 510 (1995) ("We have held that [the Fifth and Sixth Amendments] require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt."); *Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993) ("What the factfinder must determine to return a verdict of guilty is prescribed by the Due Process Clause. The prosecution bears the burden of proving all elements of the offense charged, and must persuade the factfinder 'beyond a reasonable doubt' of the facts necessary to establish each of those elements." (citations omitted)); *Patterson v. New York*, 432 U.S. 197, 210 (1977) ("[T]he Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged."); *Coffin v. United States*, 156 U.S. 432, 453 (1895) ("The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law."); *United States v. Cummings*, 468 F.2d 274, 280 (9th Cir. 1972) (the presumption of innocence "is the converse of the government's burden to prove and persuade beyond a reasonable doubt").

If we view what happened in this case as constitutional error, we must reverse unless the error was harmless beyond a reasonable doubt. *See Neder v. United States*, 527 U.S. 1, 15 (1999). If we view what happened in this case as non-constitutional error, we must reverse unless "it is more probable than not that the error did not materially affect the verdict." *United States v. Mitchell*, 172 F.3d 1104, 1111 (9th Cir. 1999).[25]

[15] In our view, the instruction specifically intended to be curative by the district court was inadequate to correct the district court's earlier error and, therefore, precludes the Government from meeting the burden under either test. As noted earlier, the district court instructed the jury that "defendants in a criminal case are presumed innocent unless or until such time as the evidence establishes their guilt." This instruction was not adequate to correct the Prosecutor's improper comment because it fails to set forth the Government's proper burden of persuasion — namely, guilt beyond a reasonable doubt.

In *United States v. Cummings*, 468 F.2d 274 (9th Cir. 1972), we considered the following instruction:

> Presumptions, like the presumption of innocence, are also deductions and conclusions. They are deductions or conclusions which the law requires the jury to make in the absence of evidence which leads the jury to a different or contrary conclusion. A presumption continues to exist only so long as it is not

---

[25]We applied the harmlessness test for non-constitutional error to a Prosecutor's burden-shifting closing argument in *United States v. Cox*, 633 F.2d 871 (9th Cir. 1980). *Cox*, however, is factually distinguishable from this case because in *Cox*, the district court sustained defense counsel's objection and admonished the prosecutor. *See* 633 F.2d at 875. The critical difference in this case is that the district court initially *ratified* the Prosecutor's burden-shifting by stating in the presence of the jury, "That's proper rebuttal. Go ahead. You are all right."

> overcome or outweighed by evidence to the contrary. But unless and until the presumption is outweighed, the jury should find in accordance with the presumption of innocence.

*Id.* at 280. We found error in this instruction because "[t]he presumption [of innocence] does not disappear when evidence to the contrary is received; it is overcome *only by evidence convincing the jury beyond a reasonable doubt*." *Id.* (emphasis added). In this case before us, the district court's curative instruction failed to state that *only* evidence that convinces the jury of guilt *beyond a reasonable doubt* will overcome the presumption of innocence.

The district court's curative instruction was flawed in other respects as well. It did not specify that the presumption of innocence "go[es] with the jury when it deliberates." *Cummings*, 468 F.2d at 280. The district court's instruction should have done so — particularly because of the Prosecutor's statement that the "presumption, when you go back in the room right behind you, is going to *vanish* when you start deliberating." It is true that, in its standard instructions at the conclusion of the evidence, the district court told the jury that the defendants "are presumed innocent." But the jury may have tried to reconcile this instruction with the district court's earlier erroneous instruction — *i.e.*, that "defendants in a criminal case are presumed innocent unless or until such time as the evidence establishes their guilt" — by concluding that criminal defendants "are presumed innocent" *only until* deliberations begin.

The district court also delayed its curative instruction over a period that spanned more than fifty pages of transcript and then failed to tie explicitly the instruction to the Prosecutor's and the court's earlier statements. The district court did not tell the jury that the Prosecutor had been wrong, notwithstanding that the Prosecutor's statement was patently improper and intentional, as the Prosecutor confirmed when he stated,

"That's what I said . . . when they get back there and start looking at it is when the presumption takes over, the presumption of guilt." Most importantly, the district court never told the jury of the earlier mistake when the judge ratified the Prosecutor's burden-shifting statement.

We recognize that in its prepared jury instructions, the district court explained the reasonable doubt standard and told the jury that the Government bears the burden of proving every element beyond a reasonable doubt. At that point, however, the proper instruction regarding burden of proof became one of several conflicting statements that the court made to the jury. When a district court delays its curative instruction on an error so fundamental, the court must refer *specifically* to its earlier error so that the jury understands which of the court's instructions should be followed and which should be ignored.

[16] Based on the district court's ratification of the Prosecutor's intentional and improper burden-shifting statement, we cannot conclude that what happened in this case was harmless under any standard of harmlessness.[26] Accordingly,

---

[26]While we do not address the other alleged instances of misconduct by the Government in this case, we are nonetheless deeply troubled by the Prosecutor's conduct throughout the trial.

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

the convictions of the ten Defendants who opted for trial must be reversed on this basis as well.

**[17]** Although we find the Prosecutor's burden-shifting statement to have been intentional and not harmless, it does not bar retrial. For the Double Jeopardy Clause to bar retrial, Defendants must demonstrate that the "governmental conduct in question [was] intended to 'goad' the defendants into moving for a mistrial." *Oregon v. Kennedy*, 456 U.S. 667, 676 (1982). In other words, "unless [the Prosecutor] is trying to abort the trial, his misconduct will not bar a retrial. It doesn't even matter that he knows he is acting improperly, provided that his aim is to get a conviction. The only relevant intent is intent to terminate the trial, not intent to prevail at this trial by impermissible means." *United States v. Oseni*, 996 F.2d 186, 188 (7th Cir. 1993) (citations omitted); *see also United States v. Lewis*, 368 F.3d 1102, 1108 (9th Cir. 2004) (noting that the Double Jeopardy Clause "prevents prosecutors from sinking a case they knew was doomed to end in an acquittal in the hope of having better luck before a second jury"). Based on the "objective facts and circumstances" discernable from the record, *Kennedy*, 456 U.S. at 675, we cannot conclude that the Government was trying to abort the trial here. Accordingly, our finding of prosecutorial misconduct does not trigger the Double Jeopardy Clause's bar to retrial.

### D. The Evidence Was Sufficient to Sustain Defendants' Convictions[27]

It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions . . . are apt to carry much weight against the accused when they should properly carry none.

*Berger v. United States*, 295 U.S. 78, 88 (1935).

[27]We review claims of insufficient evidence *de novo*. *See United States v. Odom*, 329 F.3d 1032, 1034 (9th Cir. 2003). "Evidence is sufficient if,

Eight of the ten Defendants who opted for trial — Go-Fast Defendant Lopez and all seven of the *Gran Tauro* Defendants — assert that the Government's evidence was insufficient to support their convictions. Although we have already held that the convictions of the ten Defendants who opted for trial must be reversed, "we must still consider [the] contention[s of these eight Defendants] that the evidence was insufficient to sustain [their] conviction[s], because a challenge to the sufficiency of the evidence implicates a defendant's rights under the Double Jeopardy Clause." *United States v. Boulware*, 384 F.3d 794, 809-10 (9th Cir. 2004) (citing *United States v. Recio*, 371 F.3d 1093, 1104 (9th Cir. 2004); *United States v. Gergen*, 172 F.3d 719, 724-25 (9th Cir. 1999)). That is, we must determine whether the evidence presented against the eight Defendants was sufficient to sustain their convictions "in order to determine whether there should be an acquittal or retrial upon remand." *Gergen*, 172 F.3d at 724.

As noted earlier, Go-Fast Defendant Lopez and his fellow crew members were convicted of both conspiracy to possess cocaine aboard a vessel with intent to distribute (Count One) and possession of cocaine aboard a vessel with intent to distribute (Count Two). The *Gran Tauro* Defendants were convicted of only conspiracy to possess cocaine aboard a vessel with intent to distribute (Count One). As Defendants and the Government agree, Defendants' sufficiency claims turn on whether the Government submitted sufficient evidence of Defendants' knowledge of the presence of cocaine aboard the Go-Fast. "There need not be [direct] evidence of specific intent to distribute because that intent can be inferred from the large quantity of cocaine" — 1,964 kilograms — recovered. *Klmavicius-Viloria*, 144 F.3d at 1263 (citing *United States v. Humphrey*, 759 F.2d 743, 751 (9th Cir. 1985)). We first con-

---

viewed in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citing *United States v. Carranza*, 289 F.3d 634, 641 (9th Cir. 2002)).

sider Go-Fast Defendant Lopez's contention that the evidence was insufficient to support his conviction.

### 1. Go-Fast Defendant Lopez[28]

Lopez argues that the evidence cannot sustain his conviction because the Government proved nothing more than his "mere presence" aboard a vessel that happened to contain almost 2,000 kilograms of cocaine. In doing so, Lopez relies on a handful of our cases that can be characterized as embracing the "mere houseguest," "mere passenger," or "mere presence" defenses to narcotic trafficking liability. *See, e.g., United States v. Estrada-Macias*, 218 F.3d 1064, 1066 (9th Cir. 2000) (holding that living in a trailer at a site where methamphetamine was being produced and knowing that it was being produced, without evidence of participation in

---

[28]Go-Fast Defendants Carrasco and Murillo do not contest the sufficiency of the evidence against them. As noted earlier, Go-Fast Defendant Reina's appeal, having already been decided, is not before us. *See supra* note 9. And, as also noted earlier, we deny Go-Fast Defendant Aborno's motion to join in his co-Defendants' challenges except with respect to Congress' power to enact the MDLEA. *See supra* note 21. Accordingly, with respect to the evidence against the Go-Fast Defendants, we consider whether the evidence was sufficient to sustain only Defendant Lopez's conviction.

methamphetamine production or distribution, was insufficient to sustain conviction for conspiracy to manufacture methamphetamine); *United States v. Vasquez-Chan*, 978 F.2d 546, 549-50 (9th Cir. 1992) (holding that being a caretaker and a guest in a house where cocaine was kept and knowing of the cocaine's presence, without evidence of participation in the scheme to distribute the cocaine, was insufficient to sustain conviction for possession with intent to distribute cocaine); *United States v. Sanchez-Mata*, 925 F.2d 1166, 1168 (9th Cir. 1991) (holding that being "merely a passenger" in a vehicle transporting marijuana is insufficient to sustain a conviction for possession with intent to distribute narcotics or conspiracy to possess with intent to distribute narcotics); *United States v. Whitman*, 469 F.2d 1370, 1370 (9th Cir. 1972) (holding that "mere presence" in a vehicle carrying marijuana is insufficient to sustain a conviction for "facilitating the transportation of marihuana"); *see also United States v. Herrera-Gonzalez*, 263 F.3d 1092, 1096-97 (9th Cir. 2001) (discussing, *inter alia*, *Estrada-Macias*, *Vasquez-Chan*, and *Sanchez-Mata*).

Were Lopez temporarily residing in or visiting a house where narcotics were kept or manufactured, merely riding in an automobile that contained narcotics, or perhaps even aboard a vessel significantly larger than the Go-Fast, these precedents might compel us to conclude that the evidence against him was insufficient to sustain his conviction. But Lopez's case is distinguishable from all of these scenarios, and, as the Government properly notes, we have already articulated "a number of factors" that may be used to demonstrate "knowing participation" in a maritime narcotics-trafficking prosecution under the MDLEA. *Klimavicius-Viloria*, 144 F.3d at 1263.

These factors include:

> a long voyage on a small vessel evincing a close relationship between captain and crew; suspicious behavior or diversionary maneuvers before appre-

hension; attempts to flee; inculpatory statements made after apprehension; witnessed participation as a crewman; obviousness of the contraband; or absence of equipment necessary to the intended use of the vessel.

*Id.* (quoting *United States v. Ospina*, 823 F.2d 429, 433 (11th Cir. 1987)). The factors relevant in this case include the length of the Go-Fast's voyage, the Go-Fast's size, and the Go-Fast crew's suspicious behavior and diversionary maneuvers.

As we noted earlier, the Go-Fast was of the short-range variety, with one small cabin and estimated by the Government's expert to be between twenty-five and thirty-five feet in length. In addition to the 1,964 kilograms of cocaine, the Go-Fast contained at least a dozen 55-gallon drums of gasoline, suggesting that its planned voyage was lengthy and, as the Government's expert opined, likely destined for Central Mexico.[29] Once detected by the *De Wert*'s helicopter, the Go-Fast engaged in diversionary maneuvers, weaving left and right, jettisoning the large bales of cocaine, and eventually crashing into the rear of the *Gran Tauro*. Additionally, once

---

[29]The Defendants who opted for trial contend that the district court erred when it admitted expert testimony regarding maritime drug smuggling. According to Defendants, this evidence constituted inadmissible "drug courier profile evidence." We review a district court's decision to admit expert testimony for abuse of discretion. *See United States v. Dorotich*, 900 F.2d 192, 194 (9th Cir. 1990). The district court's decision here to admit the Government's expert testimony was not an abuse of discretion. *See Klimavicius-Viloria*, 144 F.3d at 1260 (finding that district court did not abuse its discretion when it allowed a Government expert to testify "about fifteen different smuggling routes over air, land and sea, and gave a detailed explanation of the complexity of maritime smuggling. She related how mother ships, which may be disguised as fishing vessels, take circuitous routes to their destinations to avoid detection. She also explained that drug trafficking organizations are compartmentalized, in that different groups are responsible for different functions, so that each group has limited knowledge of the operation.").

the Go-Fast began to capsize, its crew — including Lopez — stripped themselves naked in an apparent attempt to remove any trace evidence of having handled the cocaine. From this evidence, "any rational trier of fact could have found" that no member of the Go-Fast crew could have been aboard that vessel without knowing of the cocaine's presence and participating in its transport. *Odom*, 329 F.3d at 1034. Accordingly, we find that the evidence was sufficient to sustain Lopez's conviction.

### 2.   The *Gran Tauro* Defendants

Like Lopez, the seven *Gran Tauro* Defendants argue that the Government failed to establish that they were knowing participants in the Go-Fast crew members' conspiracy to transport cocaine. In response, the Government relies on *Klimavicius-Viloria*, where we said that "[c]ourts have found knowing participation [in a maritime narcotics-trafficking scheme] when a ship's asserted legitimate purpose *appears to be a ruse*." 144 F.3d at 1264 (emphasis added). The Government then argues that there is convincing evidence in this case that the *Gran Tauro*'s alleged fishing expedition was cover for it serving as a floating gasoline station and that this suggests that the *Gran Tauro* Defendants knowingly participated in the drug trafficking scheme. We agree with the Government that the evidence properly allowed the jury to conclude beyond a reasonable doubt that the *Gran Tauro*'s alleged fishing expedition was a ruse, that the *Gran Tauro*'s true purpose was to serve as a floating gasoline station, and that the *Gran Tauro*, did in fact, refuel the Go-Fast. We also agree with the Government that, from this evidence, a reasonable jury could conclude beyond a reasonable doubt that the *Gran Tauro* Defendants knowingly agreed to refuel vessels carrying narcotics.

On each occasion that the *Gran Tauro* was observed (September 1, 2, 7, 9, and 10), all eye-witnesses aboard the *De Wert* and its helicopter saw the *Gran Tauro* dead in the water

or moving very slowly with no one aboard fishing. LEDET team members testified that the *Gran Tauro*'s fishing nets were stored improperly, dry, rotted, and had dry floats. The vessel's gangions and hooks were on the second level of the vessel and not easily accessible for fishing. The vessel's only fishing crane was rusted and unusable. Though the ice in the fish hold was observed to be clean and fresh during the LEDET team's September 3, 2000, boarding, by September 11, the ice was glazed over and appeared to have not been stirred.[30] The fish aboard were not stored whole as is usually the case on fishing vessels, but instead were perfectly layered, filleted, and clean, as if ready for market.[31]

Further supporting the Government's theory that the *Gran Tauro*'s purported fishing expedition was a ruse is the fact that the *Gran Tauro* was found well outside its approved fishing zones. The Government presented evidence from which a jury could conclude, Barnaza's protestations to the contrary notwithstanding, that he knew the locations of the *Gran Tauro*'s approved fishing zones (Buenaventura Zones 2 and 3) and knew how to use the high frequency radio aboard it.[32]

---

[30]By the time the *Gran Tauro* reached San Diego on September 26, 2000 — one day after its scheduled return to port at Buenaventura — its ice had entirely solidified into a block and the fish below it was discolored, odoriferous, and unmarketable. The Government presented evidence that the fish was likely bad by as early as September 11, 2003, as no member of the *Gran Tauro*'s crew ate any of the filleted fish from its hold during their trip to San Diego, notwithstanding that the crew claimed to run out of food and had to be replenished by the *Valley Forge*.

[31]Had the 950 kilograms of fish aboard the *Gran Tauro* been stored whole but gutted and de-headed, the quantity might suggest that the vessel was actually on a fishing expedition.

[32]The Government introduced into evidence the *Gran Tauro*'s log book, which indicated that, on two prior occasions in June 2000, while under the control of Barnaza, the *Gran Tauro* had in fact fished in Zones 2 and 3. Though Defendants did not object to the admission of the log books when originally admitted, Barnaza's counsel objected on hearsay and Rule 404(b) grounds to the Government's examination of Petty Officer Seda

Finally, when Chief Warrant Officer Van Pelt boarded the *Gran Tauro* on September 3, 2000, he found almost 6,000 gallons of gasoline in the *Gran Tauro*'s tanks. The smell of gasoline was so noticeable that both the September 3 and September 11 LEDET boarding teams could smell it from outside the *Gran Tauro* as they approached on their boarding boats. Notwithstanding the thousands of gallons of gasoline found aboard, Barnaza claimed that the *Gran Tauro*'s only gasoline was contained in one 55-gallon drum, and Marquez stated that all the tanks aboard the *Gran Tauro* were filled with diesel — the *Gran Tauro*'s fuel-type. When the *Gran Tauro* was boarded on September 11, 2000, approximately three-quarters of its gasoline supply had been depleted and its pump and hoses smelled of gasoline.

The *Gran Tauro* Defendants argue that, regardless of how compellingly or convincingly this evidence established that the *Gran Tauro* was a refueling — and not a fishing — vessel, the Government, nonetheless, failed to offer any evidence that the *Gran Tauro*'s crew knew that the Go-Fast or any other vessel that it may have refueled in September 2000 was carrying narcotics. In support of this argument, the *Gran*

---

about their contents. The district court properly overruled these objections. First, the log book clearly falls under the business records exception to the hearsay rule. *See* Fed. R. Evid. 803(6). Barnaza contends that the log book does not fall under the business record exception because Barnaza, who refused to testify, did not authenticate it. This argument fails, however, because Van Pelt's testimony that Barnaza gave it to him with the rest of the *Gran Tauro*'s documents provides sufficient authentication.

Nor is the log inadmissible 404(b) evidence. The log book was not admitted as other bad act evidence, but rather as evidence of Barnaza's knowledge of Zones 2 and 3 and "absence of mistake" when the *Gran Tauro* was found outside of Zones 2 and 3. *See* Fed. R. Evid. 404(b). Barnaza asserts that, even if the log book was not "other bad acts" evidence, it was still improperly admitted because the Government failed to comply with Rule 404(b)'s notice provision. This assertion is belied by the record. Barnaza had access to the log book months before trial and it was on the Government's trial exhibit list.

*Tauro* Defendants rely on our decision in *Estrada-Macias*. In *Estrada-Macias*, we recognized that, "[w]hen there is an innocent explanation for a defendant's conduct as well as one that suggests that the defendant was engaged in wrongdoing, the government must produce evidence that would allow a rational jury to conclude beyond a reasonable doubt that the latter explanation is the correct one." 218 F.3d at 1067 (quoting *Vasquez-Chan*, 978 F.2d at 549). The *Gran Tauro* Defendants assert that their "innocent explanation" is that the *Gran Tauro* and its crew departed Buenaventura on an expedition to profit from refueling other vessels on the high seas and that the Government provided no evidence to allow the jury to reject this explanation beyond a reasonable doubt.

**[18]** We reject this contention. It is well-settled in this circuit that, once the existence of a conspiracy is established, a defendant may be convicted of knowing participation therein if the evidence establishes, beyond a reasonable doubt, "even a slight connection" between the defendants and the conspiracy. *United States v. Wright*, 215 F.3d 1020, 1028 (9th Cir. 2000). There is no doubt that the Government established a "slight connection" between the *Gran Tauro* Defendants and the cocaine recovered from the Go-Fast's debris field. Moreover, we will accept a defendant's allegedly "innocent explanation" only when that explanation is plausible. *Compare United States v. Jose Luis L.*, 978 F.2d 543, 545-46 (9th Cir. 1992) (insufficient evidence to support conviction for possession where defendant's story was plausible and consistent with defendant's actions), *and Vasquez-Chan*, 978 F.2d at 553 (same), *with Mayes*, 524 F.2d at 807-08 (9th Cir. 1975) (sufficient evidence to support conviction for possession where the only innocent explanation of the evidence was so implausible that a reasonable jury could have dismissed it). It is highly improbable that anyone unconnected with the conspiracy would know of the existence of other vessels needing gasoline, such as the Go-Fast, much less be aware of their precise location at a given time and be able to sell them gasoline in the middle of the high seas. Accordingly, we find that the evi-

dence was sufficient to establish that the *Gran Tauro* Defendants knowingly participated in the Go-Fast crew members' conspiracy to possess cocaine aboard a vessel with intent to distribute and that the indictment against the *Gran Tauro* Defendants, though dismissed for the reasons discussed earlier, is without prejudice to re-indictment and retrial.

## CONCLUSION

In light of the foregoing, we reverse the convictions of the ten Defendants who opted for trial and remand with instructions that the district court dismiss the indictment because the district court erroneously exercised jurisdiction over these Defendants without first requiring the Government to allege in the indictment and prove to a jury beyond a reasonable doubt certain facts necessary to establish the district court's jurisdiction. We also find that, even if the district court had jurisdiction over these Defendants, we would still reverse their convictions because of the Prosecutor's improper closing argument and the district court's failure to adequately cure it. The district court's dismissal shall be without prejudice because the Government's evidence was sufficient to sustain these Defendants' convictions and the prosecutorial misconduct did not trigger the Double Jeopardy Clause's bar to retrial. We affirm Defendant Aborno's conviction because we reject the one challenge he raises that is properly before us.

**REVERSED IN PART, AFFIRMED IN PART, and REMANDED.**

---

BRUNETTI, Circuit Judge, concurring in part and dissenting in part:

The majority of the panel has reversed the convictions of the ten Defendants who opted for trial, holding that the district court erred when it concluded it had jurisdiction over the

defendants and, alternatively, because of the Government's prosecutorial misconduct. I agree with the majority opinion, Section D, that the evidence was sufficient to sustain the defendants' convictions and that the *Gran Tauro* defendants' convictions should be reversed on jurisdictional grounds.

I disagree with the majority, however, with regard to the Go-Fast defendants because the district court correctly decided the issue of statutory jurisdiction as applied to the Go-Fast defendants, and any prosecutorial misconduct resulted in harmless error. Therefore, I respectfully dissent.

## Proceedings Below

Before trial, Defendants sought to dismiss the indictment on the basis that the district court lacked jurisdiction. The district court denied this motion, after an evidentiary hearing, finding that it had jurisdiction over both the Go-Fast and *Gran Tauro* defendants, in part because the Go-Fast was a stateless vessel.

On October 18, 2001 Defendants Aborno and Reina pled guilty to both charges (conspiracy to possess cocaine with intent to distribute and possession of cocaine with intent to distribute, both under the MDLEA) and were sentenced to 108 and 135 months in custody, respectively. The remaining ten defendants went to trial.

At the close of remaining defendants' three-week trial, the Assistant U.S. Attorney made the following statement in his rebuttal arguments:

> [I]n a short period of time, the case will be handed to you. You're going to go back into that deliberation room and that presumption of innocence, that presumption of innocence that these men have all been cloaked with the last year, the last year while we've litigated motions — you've heard about all

the motions that have been held beforehand. That's why it's taken so long to get here. That presumption, when you go back in that room right behind you, is going to vanish when you start deliberating. And that's when the presumption of guilt is going to take over once you —

Defendants' counsel responded to this statement with a flurry of objections, which the trial court judge overruled. Immediately after the court overruled the objections, defense counsel made the following additional comments: "That's misconduct. There is no presumption of guilt" and "I move for mistrial," to which the judge responded, "That's proper rebuttal. Go ahead. You are all right." Defense counsel finished by stating, "Presumption of guilt can't be proper, Your Honor." The Assistant U.S. Attorney continued with his remarks which lasted some 20 pages-worth of trial transcript until a break in the proceedings allowed counsel and the trial judge to discuss more fully the Assistant U.S. Attorney's statement.

Defense counsel forcefully argued that not only was the Government's statement a misstatement of law but that it constituted prosecutorial misconduct. Counsel stated that they did not believe that a curative instruction could cure the prejudice suffered by the defendants from this remark. When given the opportunity to respond, the Assistant U.S. Attorney said, "That's what I said, when they get back there and start looking at it is when the presumption takes over, presumption of guilt." The court concluded that the Assistant U.S. Attorney's statement did not constitute misconduct and denied the motion for mistrial, but agreed to give a curative instruction. After the break, the court allowed the Assistant U.S. Attorney to continue without making any statement to the jury, and only after he finished his rebuttal arguments—this time, some 36 transcript pages later—did the court make the following statement:

[I]t is my duty at this time to instruct you on the law that applies in this case . . . Also, I'm sure you're all

aware of this, but let me just tell you this before we begin. There is no such thing as a presumption of guilt in a criminal case. All defendants in a criminal case are presumed to be innocent unless or until such time as the evidence established guilt.

The court continued with his instructions, including stating that "the defendants are presumed to be innocent," "the government has the burden of proof of proving every element of each charge beyond a reasonable doubt," and "[n]o presumption of guilt may be raised and no inference of any kind may be drawn from the fact that a defendant did not testify." The court then provided a comprehensive explanation of the legal standard for proof beyond a reasonable doubt.

The ten defendants were convicted on November 9, 2001, after a three-week jury trial. Three of the ten defendants were convicted of both counts (conspiracy to possess cocaine with intent to distribute and possession of cocaine with intent to distribute, both under the MDLEA ) and the remaining seven were convicted solely of the conspiracy count.

## Discussion

### I. Jurisdictional Inquiry

Although I agree with the majority that the district court erred in concluding it had jurisdiction over the *Gran Tauro* defendants, I diverge from the majority in its conclusion that the district court erred in finding it had jurisdiction over the Go-Fast defendants.

Section 1903(a), under which all defendants were prosecuted, states:

It is unlawful for any person on board a vessel of the United States, *or on board a vessel subject to the jurisdiction of the United States*, or who is a citizen

of the United States . . . on board any vessel, to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

46 App. U.S.C. § 1903(a) (emphasis added). In this circuit, whether a vessel is subject to the jurisdiction of the United States involves an analysis of two distinct elements, which have been coined "statutory jurisdiction" and "constitutional jurisdiction." *United States v. Medjuck*, 156 F.3d 916, 918 (9th Cir. 1998). The district court found that it had statutory jurisdiction over the Go-Fast defendants because the Go-Fast was a stateless vessel, or a "vessel without nationality."

Section 1903(c) defines vessels that are "subject to the jurisdiction of the United States" under the MDLEA. Included is "a vessel without nationality." § 1903(c)(1)(A). "A vessel without nationality," for purposes of the MDLEA, can take one of three forms:

(A)   a vessel aboard which the master or person in charge makes a claim of registry, which claim is denied by the flag nation whose registry is claimed;

(B)   any vessel aboard which the master or person in charge fails, upon request of an officer of the United States empowered to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel; and

(C)   a vessel aboard which the master or person in charge makes a claim of registry and the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.

46 App. U.S.C. § 1903(c)(2). Section § 1903(c)(3) further defines "a claim of nationality or registry" as including only:

(A)   possession on board the vessel and production of documents evidencing the vessel's nationality in accordance with article 5 of the 1958 Convention on the High Seas;

(B)   flying its flag nation's ensign or flag; or

(C)   a verbal claim of nationality or registry by the master or person in charge of the vessel.

*Id.* § 1903(c)(3).

In 1996, Congress amended § 1903 by adding § 1903(f), which states: "Jurisdiction of the United States with respect to vessels subject to this chapter is not an element of any offense. All jurisdictional issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge." 46 U.S.C. App. § 1903(f). Congress made clear through this amendment that the jurisdictional requirement is not an element of a § 1903(a) substantive offense, but rather is an issue that goes only to the subject matter jurisdiction of the federal courts. Constitutional limitations on congressional power to remove issues from the jury's determination are narrow: "[t]he definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute." *Staples v. United States*, 511 U.S. 600, 604 (1994) (internal quotations omitted). Although Congress's decision on how to define the elements of the offense "is usually dispositive," *McMillan v. Pennsylvania*, 477 U.S. 79, 85 (1986), the majority's holding will render § 1903(f) meaningless in this case.

We have analyzed the effect of § 1903(f) in two cases, and in both cases held that the determination of whether the court had jurisdiction over the vessel, or the waters where the vessel was intercepted, was a question for the court, consistent with the language of Congress' 1996 amendment. In *United States v. Smith*, 282 F.3d 758 (9th Cir. 2002), the district court con-

cluded that under § 1903(f), the court, not the jury, should decide both (1) whether the United States has jurisdiction over the place where the vessel was allegedly intercepted; and (2) whether the vessel was actually intercepted at that place. *Id.* at 766. This circuit rejected the district court's interpretation as "over-inclusive," holding that where the vessel was actually intercepted was a question for the jury, but that § 1903(f) empowers the court to make the determination of whether the United States has jurisdiction over that location. *Id.*

In the subsequent case of *United States v. Moreno-Morillo*, 334 F.3d 819 (9th Cir. 2003), as in this case, jurisdiction depended not on the factual determination of where the ship was seized, as in *Smith*, but, rather, of the ship's status vis-a-vis statelessness. *Id.* at 829. The court noted that unlike *Smith*, this case "cannot be separated neatly into two parts," but concluded that the district court properly determined "that the Defendants' vessel falls within the definition of 'vessel without nationality' under the MDLEA." *Id.* at 830. The court reasoned that because the defendants had failed to challenge the substance of the State Department certificate noting that Colombia would neither affirm nor deny the vessel's registry, "the substance of the certificate stands as the only—and therefore uncontroverted—evidence in the record regarding statelessness." *Id.*

The case before us falls squarely within the contours of *Smith* and *Moreno-Morillo*. In *Smith*, the court noted that "the 'jurisdictional issue'—whether the United States has jurisdiction over the waters where a vessel is allegedly intercepted—can and should be decided by the trial court as a preliminary question of law." *Id.* at 767. Here, the district court faced an analogous jurisdictional issue: whether the United States had jurisdiction over the Go-Fast. Just as in *Smith*, where the trial court determined the status of the waters in question, here, the district court determined the status of the vessel in question. The jurisdictional inquiry in this case did not involve a "fac-

tual issue," because the question was whether the United States had jurisdiction over the vessel, not whether the Go-Fast defendants were on the vessel.

This "dual inquiry" analysis is well-supported in our circuit. For example, in *United States v. Warren*, the defendant was charged with stabbing a man at a Hawaii army base, Schofield Barracks. 984 F.2d 325, 327 (9th Cir. 1993). At the outset, the district court determined that Schofield Barracks was within the jurisdiction of the United States, but the court never had the jury find whether the stabbing actually took place at the base. *Id.* We held that the district court properly decided whether the base was within the jurisdiction of the United States, but that the instruction improperly omitted the issue of whether the stabbing occurred on the base. *Id.* Here, the district court properly determined whether the Go-Fast was subject to the jurisdiction of the United States, leaving any question of whether the defendants were on the Go-Fast to the jury. "A district court may determine as a matter of law the existence of federal jurisdiction over the geographic area, but the locus of the offense within that area is an issue for the trier of fact." *Id.* (internal quotations omitted); *accord United States v. Sohappy*, 770 F.2d 816, 821 (9th Cir. 1985) (holding that district court properly determined whether "Cooks Landing" was "Indian country" and then correctly "instructed jury that they need only find that the violations occurred in Cooks Landing").

*Moreno-Morillo*'s interpretation of *Smith* further supports the position that the Go-Fast's status was a question for the court, not the jury. In *Moreno-Morillo*, the court held that since the evidence presented to the court regarding statelessness was uncontroverted, there were no factual issues for the jury to determine. 334 F.3d at 831. Here, the evidence presented with regard to the Go-Fast's status is similarly uncontroverted. A United States officer who observed the Go-Fast by using sensitive surveillance equipment testified that they saw no flags of any kind, no marking of any kind, no hull

numbers, no name on the vessel, and no home-port inscription. Moreover, when Petty Officer Craig Cruz boarded the *Gran Tauro* and asked the members of the Go-Fast if the vessel had a flag, Go-Fast defendants Reina and Murillo simply shook their heads back and forth and defendant Aborno stated "Barco no tengo bandera," which literally means, "Boat I have no flag." Officer Cruz also testified that later, when asked who was in charge of the Go-Fast, Murillo stated that the ship captain was a person named Freddy, who, according to Cruz's report "was the only one who really knew about the boat expedition." Although the court indicated that this statement was not produced for its truth, i.e., that Freddy was in fact the captain, the statement indicates that when Cruz inquired as to the Go-Fast's captain, neither Murillo nor Reina proclaimed to be the master or person in charge. Reina and Murillo individually introduced declarations to the district court indicating that they both told Cruz that they were from Colombia and that the boat was from Colombia. Murillos's declaration stated that "[I] told the Coast Guard Officers that I was a Colombian citizen from the city of Buenaventura, Colombia." "Buenaventura" was crossed out in the declaration and replaced with illegible handwriting. The declaration also stated: "I also told them that the our boat was from Buenaventura, Colombia." Again, "Buenaventura" was crossed out. Reina's declaration similarly stated that "[I] told the Coast Guard Officers that I was a Colombian citizen from the City of Valle Sudano (Colombia)." "Valle Sudano" was crossed out, and replaced with illegible writing. Reina's declaration also stated "I also told them that our boat was from Baiazolano (DM) Colombia." Taken together, this evidence does not leave any factual determinations that need to be made by the jury. The defendants' statements to Cruz that they were from Colombia are legally insignificant under the jurisdictional inquiry, as neither claimed to be the person in charge of the vessel, as required by § 1903(c)(3)(C). The statements that the boat "was from Colombia" made by persons not claiming to be the master or person in charge are also

legally insignificant, and no further facts or documents to support a "claim of nationality or registry" were asserted by the defendants. Since no evidence was presented to create a factual dispute with regard to the Go-Fast's status as a "vessel without nationality," under *Moreno-Morillo*, the district court properly determined that the vessel was stateless based on the uncontroverted evidence in the record.

For these reasons, the district court correctly concluded that it had jurisdiction over the Go-Fast defendants on the basis of the vessel being "without a nationality" under § 1903(c), and the convictions of the Go-Fast defendants should be upheld.

## II.   Prosecutorial misconduct

The majority holds that the Government committed prosecutorial misconduct by impermissibly shifting the burden of proof to the defense, and that this error was not harmless. I disagree because any prosecutorial misconduct was harmless error, and therefore the convictions of the Go-Fast defendants should not be reversed on these grounds.

Given my concurrence with the majority that the district court erred in not deciding the existence of a nexus as required by the law in this circuit, vis-à-vis the *Gran Tauro* defendants, I need only analyze the effect of the prosecutorial misconduct with regard to the Go-Fast defendants.

We review the record de novo in order to determine an error's harmlessness. *Arizona v. Fulminante*, 499 U.S. 279, 295 (1991) "The purpose of harmless-error analysis is to avoid setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." *United States v. Annigoni*, 96 F.3d 1132, 1143 (9th Cir. 1996) (internal citations omitted). "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Fulminante*, 499 U.S. at 295 (citing *Chapman v.*

*California*, 386 U.S. 18, 24 (1967)). In so doing, it must be determined whether the Government has met its burden of demonstrating that the error did not contribute to the defendant's conviction. *Chapman*, 386 U.S. at 26. The inquiry, therefore, is whether allegedly improper behavior, considered in the context of the entire trial, affected the jury's ability to judge the evidence fairly. *United States v. McKoy*, 771 F.2d 1207, 1212 (9th Cir. 1985)

Courts consider several factors in determining whether an error contributed to the defendant's conviction. Included are the relative strength of the case against the accused or whether instructions given by the trial court sufficiently diluted any prejudice. *United States v. Hawkins*, 595 F.2d 751, 755 (D.C. Cir. 1978) (prosecutor's improper statements during closing argument harmless because they "did not substantially sway the verdict") (cited with approval in *United States v. McKoy*, 771 F.2d 1207 (9th Cir. 1985)).

To determine whether the prosecutorial misconduct substantially swayed the verdict as to the Go-Fast defendants we must assess the strength of the government's case as well as the effectiveness of the court's curative instruction to determine whether the error improperly resulted in conviction. The strength of government's case is clearly established in the majority opinion, Section D, which found the evidence was sufficient to sustain the defendants' convictions. The strength of the government's case against the Go-Fast defendants, therefore, militates against a finding that the prosecutor's error produced a wrongful conviction.

Moreover, we have held that the trial judge may neutralize any potential harm of improper remarks by giving a curative instruction. *United States v. Endicott*, 803 F.2d 506, 513 (9th Cir. 1986). "A trial judge may cure the effect of improper prosecutorial comments 'by admonishing counsel to refrain from such remarks or by giving appropriate curative instructions to

the jury.' " *Id.* (citing *McKoy*, 771 F.2d at 1213; *United States v. Birges*, 723 F.2d 666, 672 (9th Cir. 1984)).

Here, as noted above, the trial court first overruled defense counsels' objections to the Government's statement, stating in response, "That's proper rebuttal. Go ahead. You are all right." After discussion with all counsel at a break, however, the court agreed to make a curative instruction, although the court refused to admonish the Assistant U.S. Attorney or indicate that his comment constituted gross misconduct. After the Assistant U.S. Attorney's rebuttal and before instructing the jury on the law that applied in the case, the court highlighted and gave a curative instruction which included a statement that there is no such thing as a presumption of guilt in a criminal case. The court then instructed the jury on the law that applied in this case and emphasized throughout his instructions that the government carried the burden of proof to prove all the elements of the charged offenses beyond a reasonable doubt.

This curative instruction is sufficient to cure any prejudice defendants suffered. Unlike in *Fulminante*, where the prosecution introduced the defendant's completely damning coerced confession, the jury here was able to ignore the prosecutor's misstatement of law and follow the trial judge's instructions as to burden of proof and presumption of innocence. *See Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1270 (9th Cir. 2000) (strong presumption that juries follow curative instructions).

In sum, the strength of the government's case against the Go-Fast defendants, coupled with the trial court's tardy, yet clearly stated, curative instruction renders the error harmless, and the convictions of the Go-Fast defendants should be upheld.

For these reasons, I dissent.